2002 SD 63

**Troy STALLINGS, Jane Shorma, and Creative Building Corporation, Plaintiffs and Appellants,**

v.

**Leycester OWENS, Jr., Helen Owens and James Reynolds, Defendants and Appellees.**

**No. 21943.**

Supreme Court of South Dakota.

Argued March 27, 2002.

Decided May 22, 2002.

Rick Johnson of Johnson, Eklund, Nicholson & Peterson, Gregory, South Dakota, David V. Vrooman, Sioux Falls, South Dakota, Attorneys for plaintiffs and appellants.

James E. McMahon, Sioux Falls, South Dakota, Tamara A. Wilka of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota, Attorneys for defendants and appellees Owens.

Michael L. Luce, Melissa C. Hinton of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for defendants and appellees Reynolds.

KONENKAMP, Justice.

[¶ 1.] A developer discussed with the landowners the potential sale of their land conditioned on the feasibility of obtaining sufficient lot purchasers and local government approval. When the developer obtained commitments for lot purchases and offered the landowners their asking price, the landowners nevertheless decided to sell the land to a neighbor. The developer sued the landowners for breach of an oral joint venture agreement and sued the neighbor for intentional interference with contractual relations. The circuit court granted summary judgment against the developer on all issues. We conclude that the essential elements for a binding joint venture agreement were missing and the absence of an agreement moots the question of the alleged tortious interference. Accordingly, we affirm.

## Background

[¶ 2.] Defendants Leycester and Helen Owens are the owners of a 10.67-acre parcel of land in the southern part of Sioux Falls, South Dakota. James Reynolds is a neighbor, as well as a physician-partner with Leycester Owens in North Central Heart Clinic. In the early 1980s, Reynolds had suggested to Dr. and Mrs. Owens (the Owens) that they buy the tract, with a view toward eventually building a house there. However, by the summer of 1998, the Owens, not having developed the property, decided to sell it. As they had given Reynolds a right of "first and last refusal," the Owens asked Reynolds whether he was interested in purchasing it. At that point, Reynolds declined to exercise his option.

[¶ 3.] Plaintiffs Troy Stallings and his wife, Jane Shorma, are land developers, operating under their business, Creative Building, Inc. In September 1998, Troy Stallings, heard that the Owens were interested in selling the property. He called them to determine what their intentions were. At their first meeting, Leycester Owens told Stallings that he was asking $700,000 for the property. Interested, Stallings accompanied Owens to the land, and they walked it together. On that occasion, Owens also introduced him to Reynolds and his wife Debbie, and the four of them discussed development possibilities. Stallings expressed the view that the parcel might be divided into eight or nine lots for home sites. According to Stallings's uncontested testimony, Reynolds mentioned that he was not, at that time, interested in exercising his option. In his own testimony, Reynolds explained his initial refusal by reference to another condition which Owens had placed on the sale: it was to be developed only in such a way as would gather the approval of the four neighboring households. At this first meeting, Stallings understood that Reyn-

olds had given the Owens *carte blanche* to develop the property as they chose.

[¶ 4.] At a second, later meeting, Stallings and Leycester Owens discussed the price that eight lots would be likely to bring and the cost of necessary infrastructure. By that time, Stallings had engaged the services of an engineer-surveyor, who estimated the development costs at $338,200. Stallings reckoned that the individual lots would sell for $125,000 at most; Owens thought that they might bring $150,000 each. At the end of the meeting, Stallings agreed to see whether he could find buyers willing to pay $150,000 per lot, and Owens agreed to let Stallings stake the property and to allow prospective buyers to look it over. Stallings proceeded to do so, and, according to him, told his prospects that the Owens were "selling the property to him, ... that the property was going to be divided into eight lots, and that he would then close on the property with [the Owens] and would expect them to close immediately on their lots." According to his testimony, Stallings also imparted three more bits of information to potential buyers: (1) that the existing households in the neighborhood were generally opposed to the proposed development, (2) that if the eight-lot subdivision were not approved by the Planning Commission, they would not be obliged to purchase their lots because he would not consummate the purchase with the Owens, and (3) that he, Troy Stallings (not the Owens), was to be the home developer on all of the lots. Stallings also testified that, on more than one occasion, when he asked to put his agreement with Leycester Owens in writing, Owens responded that no contract was necessary because his word was his bond. Owens denied such an exchange.

[¶ 5.] The opposition from the neighbors stemmed from two principal causes. First, the acreage had been a *de facto* park for the neighborhood for over fifteen years, and the neighbors were reluctant to lose the recreational opportunities and aesthetic enhancement it afforded. Second, the proposed entry to the property would at least double the traffic on an already narrow private road. In addition, the neighbors were variously concerned about drainage, access by fire and police vehicles, and the length of the road leading to the cul-de-sac that would provide access to the new houses.

[¶ 6.] Hearing of the development plans, the neighbors began to meet in late 1998 or early 1999 to discuss what might be done to deter the development. They engaged a lawyer to advise them and a surveyor to provide an independent opinion of the likely topical impacts of the development. The neighbors also began a letter-writing campaign to the Sioux Falls Planning Commission. Because the development called for more than one house on the property, the Commission had to approve the plan before work could begin. The plan was submitted to the Commission in the early spring of 1999. After studying it, the Commission's staff recommended that the development be limited to four single-family residences. An initial hearing before the Commission was to be held on April 7, 1999, but, learning of the staff's recommendation, Stallings's surveyor-engineer requested a postponement until May 5, 1999, so that the plans could be reworked to address the problems mentioned in the staff report. The Commission granted the request.

[¶ 7.] The days just before the May 5 hearing were eventful. On May 3, the Owens hosted a meeting of the neighbors at their home to present the development plan, at that time somewhat revised in response to the concerns of the Commission's staff, but still containing eight lots. The neighbors argued vigorously that the

property should be divided into no more than two lots. On the next evening, the neighbors met again to complete their planned presentation for the next day's Commission hearing. After the meeting was over, Reynolds telephoned Leycester Owens to report that the neighbors were "dead set against" the project. During that conversation, Reynolds offered to purchase the property for $550,000. Owens rejoined that he would be willing to consider an offer of $575,000, and Reynolds amended his offer to $575,000 payable on a contract for deed at eight percent interest. On the morning of May 5th, Stallings spoke with Leycester Owens by telephone and offered to pay $600,000 for the land and to divide it into no more than four lots. Owens, in turn, telephoned Reynolds to report this offer and to ask whether it would be acceptable to the neighbors. Upon hearing that a four-residence development would still meet with the neighbors' opposition, Owens agreed to sell the land to Reynolds for $575,000. Owens then called Stallings to tell him that he had accepted Reynolds's offer. According to testimony, Reynolds, himself one of the neighbors opposed to a four-unit development, as much wished to save the Owens from the opprobrium of the neighbors as the Owens were, by that point, unwilling to incur it. (Despite the offer and acceptance, Owens testified nearly nine months later that his agreement with Reynolds had not yet been consummated with an actual sale.) Neither Stallings nor Owens made a presentation to the Planning Commission.

[¶ 8.] In their complaint, Stallings and Shorma allege, first, that the agreement between Stallings and the Owens was a joint venture and that the Owens breached this agreement and an implied covenant of good faith; second, that Stallings and Shorma, to their detriment, reasonably relied on this agreement and suffered economic damage as a result of the Owens' breach; third, that the Owens' representations regarding the agreement were fraught with deceit; and, fourth, that Reynolds intentionally interfered with Stallings and Shorma's legitimate business expectancy. The circuit court granted summary judgment against Stallings and Shorma.[1] On appeal, we confront the following issues: (1) Did Leycester Owens and Troy Stallings establish a joint venture? (2) Does the statute of frauds apply to the Owens–Stallings agreement, and, if so, should the Owens be estopped from relying on it? (3) Did Reynolds tortiously interfere with the Owens–Stallings agreement? (4) Did Leycester Owens commit the tort of deceit in representing to Troy Stallings that the property was actually for sale, through Stallings, to the public generally? We need not reach Issues 2 and 3 because we rule against Stallings and Shorma on Issue 1, finding no valid joint venture. We do not reach Issue 4 because Stallings and Shorma specifically waived it during oral argument.

### Analysis and Decision

[¶ 9.] What is understood in South Dakota to be a joint venture has developed

---

1. In reviewing a grant of summary judgment, we must determine whether the moving party demonstrated the absence of any genuine issues of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis to support the ruling of the trial court, affirmance of a summary judgment is proper. *Garrett v. BankWest, Inc.,* 459 N.W.2d 833 (S.D.1990) (citations omitted).

over the last century from the more general relation of partnership. From 1908 through at least 1949, this Court spoke of joint venture and partnership as synonymous. Consider the following passages. "The execution of the contract created *a partnership or a joint venture*, which was in essence and effect a partnership transaction, and, though the stock in trade was real estate, it was, as to the interests of the parties, to be regarded as personal property." *McPherson v. Swift*, 22 S.D. 165, 173, 116 N.W. 76, 79 (1908). "He testified that in the presence of respondent the doctor made a proposition to Stroub to go to South Dakota and work the farm as *a joint venture or partnership....* " *Douglas v. Beebe*, 46 S.D. 559, 561–62, 195 N.W. 165 (1923).

> The evidence of respondent, taken as a whole, and with the trial court's decision as to its verity, is sufficient to sustain the decision that *a partnership relation or that of a joint venture*, existed between the parties, authorizing the sale of the premises by Bowler, binding appellant to the terms thereof.
>
> In this approval of the trial court's decision, on the matter of the existence of a *partnership or joint venture*, there is no intention to relax the established rules, which require substance and definiteness in proof of such a claim.

*Hardman v. Lasell*, 55 S.D. 176, 183–84, 225 N.W. 301, 304 (1929). "Under these circumstances the commissioner could readily infer that the arrangement with James was simply for the purpose of augmenting McDonald's business, that there was no *partnership or joint venture* .... " *James v. McDonald*, 73 S.D. 78, 83, 39 N.W.2d 478, 480 (1949).

[¶ 10.] In *Davenport v. Buchanan*, a case predating all those mentioned above, this Court recognized the existence of a "special partnership," the antecedent of what we now know as a joint venture. 6 S.D. 376, 61 N.W. 47 (1894). In the Syllabus by the Court, we began the process of isolating the key elements of a joint venture:

> 1. A parol contract entered into between B. and D., by which they mutually agree to jointly purchase certain real property, and to contribute and pay an equal amount therefor, and to share equally in the profit or loss arising from a resale, is not an agreement for the sale of real property contemplated by section 3544 of the Compiled Laws, which requires the same, or some memorandum or note thereof, to be in writing, and subscribed by the party to be charged; but the same is *held* to be an agreement in the nature of a *special partnership*, for the purpose of dealing in a particular piece of real estate, and not within the statute of frauds.
>
> 2. The relation thus established, being of a fiduciary character, imposes upon each the duty of fair and open dealing with the other, and each has a right to rely explicitly upon the statements of the other concerning all matters pertaining to their business relations ....

*Id.* at 376, 61 N.W. at 47.[2] We see this process continuing in *Hilde v. Flood*, 81 S.D. 25, 130 N.W.2d 100 (1964). There, we found helpful guidance in Corpus Juris Secundum and American Jurisprudence:

> The court's finding that the association entered into by these parties on February 11, 1958, was a *joint venture* is, we think, well supported by the evidence.
>
> . . .
>
> ... [T]he court also found that the parties were to share the profits and losses

---

2. Note our isolation of the equal contributions and the equal sharing of profits and losses, as well as our acknowledgment of the fiduciary character of the relationship.

equally. This determination we think a proper one. Absent an agreement to the contrary, the law presumes they intended that each would share equally. 48 CJS, Joint Adventures § 11; 30 Am-Jur, Joint Adventures § 42. Flood made no effort to show that there was any percentage agreement to the contrary. Rather on this issue he confined himself to denying that their association on the Cheyenne project was a *joint venture*. On the other six projects in which they were *joint adventurers* he conceded they were to share equally. *Hilde*, 81 S.D. at 32–33, 130 N.W.2d at 104. Then, in *Fredrickson v. Kluever*, 82 S.D. 579, 152 N.W.2d 346 (1967), we distinguished partnerships and joint ventures.

A partnership is statutorily defined as an association of two or more persons to carry on as co-owners a business for profit. SDC 49.0201(1). This is ordinarily a formal association of a continuing nature for the conduct of a general business. Although a *joint venture*, or *joint adventure* as it is otherwise called, is sometimes compared to a partnership it is usually a less formal association entered into to perform a more limited business function for a more limited time.

*Id.* at 582, 152 N.W.2d at 347–48 (citing *Fishback v. United States*, 215 F.Supp. 621 (D.S.D.1963)).

■ [¶ 11.] From that background, this Court, in *Ethan Dairy Products v. Austin*, for the first time made an explicit listing of the legal elements required for a business entity to be properly termed a joint venture, with the legal consequences that denomination carries. 448 N.W.2d 226 (S.D.1989). With an eye to two passages in the Corpus Juris Secundum,[3] we wrote:

The elements of a joint venture are: (1) an agreement, express or implied, among members of a group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction and control of the enterprise.

448 N.W.2d at 228 (citing *Fredrickson, supra; Hilde, supra*). Finally, making explicit what was already implicit in *Ethan Dairy*, we have, in *Weins v. Sporleder*, settled on the following six elements, most, if not all, of which must be present for an agreement to be recognized as a joint venture. 1997 SD 111, 569 N.W.2d 16. The parties must (1) exhibit an intent to enter into a joint venture, (2) reach an agreement, express or implied, to enter that venture, (3) have a common purpose, (4) have a joint pecuniary interest in that purpose, (5) have an equal right to a voice

---

3. *"Joint venture,"* a term used interchangeably and synonymous with "joint adventure," or coventure, has been defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without the necessity of any actual partnership, corporate designation, or other business entity, or as an association of persons or legal entities to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.

48A CJS *Joint Ventures* § 2 (1981).

Certain requisite elements of the relation have been recognized by the courts, including intent to enter into a joint venture, community of interest in the performance of a common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and a duty to share in any losses which may be sustained ... and usually all of these elements must be present for a joint venture to exist; but no one of the elements essential to the creation of a joint venture is alone sufficient to establish such. 48A CJS *Joint Ventures* § 10 (1981).

in the direction and control of the venture, and (6) have (a) a right to share in the profits from the venture and (b) a duty to share in its losses. *Id.* at ¶ 44, 569 N.W.2d at 28[4] (citing *Ethan Dairy*, 448 N.W.2d at 228).

[¶ 12.] The agreement between Leycester Owens and Stallings arose from the following fact situation: The Owens wanted to sell the land; they had given Reynolds a right of first refusal; they had also promised Reynolds that the land would not be sold for a development undertaken in opposition to the wishes of the neighbors; and upon the Owens' initial inquiry in the summer of 1998, Reynolds indicated that he was not at that time interested in purchasing the property. In September 1998, Stallings learned that the Owens were interested in selling. Stallings and Leycester Owens reached an agreement that Stallings would be allowed to test the market by determining whether enough interested buyers could be found to justify his purchasing the land from the Owens at a price they would accept. With this understanding, the Owens allowed Stallings to stake the land and show it to prospective buyers. The Owens did not engage Stallings as their agent, nor did they give Stallings permission to represent to prospective buyers that the land belonged to anyone other than the Owens. In the words of his own brief,

> Stallings testified that he and Owens were in a joint venture because he had

to purchase the property from Owens. If Owens knew of somebody who wanted a lot, he would have them [sic] call Stallings. Stallings was footing the up-front costs, and, when the lots were sold, Owens was to get the first $700,000 and Stallings anything over $700,000 and the opportunity to build the houses.

[¶ 13.] As to shared intent to form a joint venture, it is clear that there was none: the Owens had property to sell, but only upon the conditions, first, that Reynolds did not offer to buy it, and, second, that the neighbors approved of the plans for developing the property. Stallings and Shorma were interested in buying the property, but only upon condition that they could find enough prospective buyers to whom they could resell the property in parcels suitable for residential lots. At best, then, we have only conditionally willing sellers and only conditionally willing buyers, and it was not entirely in the power of the one to meet the conditions of the other. The agreement they reached was itself conditional, reflecting the contingencies under which each was proceeding.[5] There was no common purpose: the parties were independent actors, working for their own ends. They did not have a joint pecuniary purpose: the Owens were the sole owners of the property and intended to sell it under appropriate conditions. They did not intend to become part-time land developers. And Stallings and Shorma made no attempt to interest the Owens

---

4. To quote *Sporleder:*

   The elements of joint venture are: 1) an intent to enter into a joint venture; 2) an agreement, express or implied, among members of a group; and 3) a common purpose to be carried out by the group; 4) a joint pecuniary interest in that purpose; 5) an equal right to a voice in the direction and control of the group; and 6) a right to share in the profits and a duty to share in any losses.

   1997 SD 111, ¶ 44, 569 N.W.2d 16, 28.

5. As we said in *Ethan Dairy*, "[c]ourts should be cautious in characterizing the nature of a business relationship without first carefully examining the usage and practice peculiar to the commercial enterprise in question." 448 N.W.2d at 228. Unfortunately, the agreement between Owens and Stallings was singular and therefore gives us no particular guidance about relevant business practices. Accordingly, our analysis is highly fact-specific.

in developing the property. Since there was no common venture, it makes no sense even to speak of an equal voice in its direction and control. Finally, even if the sale had been consummated, the Owens were to receive a fixed price, whereas Stallings and Shorma were in a position to lose or gain from the subsequent partitioning into lots and the building of houses on them. The record shows no evidence of the existence of a joint venture between these parties.

[¶ 14.] Since no joint venture was created or, indeed, any binding legal agreement, there is no occasion for us to determine whether the statute of frauds applies, nor do we reach the question of Reynolds's alleged tortious interference: there was no legally binding agreement with which Reynolds could have interfered.

[¶ 15.] Affirmed.

[¶ 16.] GILBERTSON, Chief Justice, and SABERS and AMUNDSON, Justices, and GORS, Acting Justice, concur.

[¶ 17.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.