2003 SD 13

**A.P. & SONS CONSTRUCTION,**
A Partnership, Plaintiff
and Appellant,

v.

**Earle D. JOHNSON, Jr.; Earle D.
Johnson, Jr., Trustee,** Defendants
and Appellee,

**F & M Bank; United States of America;
Thomas C. Homola,** d/b/a Hamlin
Building Center; **Aason Engineering
Company, Inc.; F.J. McLaughlin
Company, Inc.; Codington County,
South Dakota; Clausen Construction,
Inc., Satco Homes, Inc.,** and **Robert
Bauman,** Defendants.

No. 22318.

Supreme Court of South Dakota.

Considered on Briefs Nov. 18, 2002.

Decided Jan. 29, 2003.

J. Douglas Austin of Austin, Hinderaker, Hopper, Strait & Bratland, Watertown, South Dakota, Attorneys for plaintiff and appellant.

Thomas F. Burns, Watertown, South Dakota, Attorney for defendants and appellees.

AMUNDSON, Retired Justice.

[¶ 1.] A.P. & Sons Construction (A.P. & Sons) brought an action seeking to hold Earle Johnson, Jr. (Johnson) and Robert Bauman d/b/a Satco Homes Inc., (Bauman), personally liable for labor and materials provided in the development of Westview Addition. The trial court found Johnson was not personally liable. A.P. & Sons appeal. We affirm.

## FACTS

[¶ 2.] Earle D. Johnson, Jr. owned forty (40) acres of land in Watertown, SD. Bauman worked in the construction business. Robert Bauman married Johnson's niece. Bauman approached Johnson and expressed his desire to develop Johnson's property. Bauman offered to develop the land with the intention that he would be able to build houses on the lots that were sold. Although Bauman would receive no profit from the sale of the lots, he would profit from building houses. Bauman suggested that he thought Johnson's parents would have wanted the land to be developed. After considerable thought, Johnson agreed to Bauman's proposal to develop the land. It was agreed that because Johnson knew nothing about developing land and spent part of the year in Mexico, that Bauman would do the ground work on the project. Bauman would hire the engineers and contractors necessary to complete the project. It was Johnson's under-

standing that Bauman would coordinate the development aspect of the project.

[¶ 3.] In order to finance the development, Bauman obtained a loan from F & M Bank (Bank). Since Johnson owned the land to be developed, Johnson was required by the Bank to secure Bauman's loan. Johnson mortgaged his land to the Bank and personally guaranteed the loan. Johnson made no other guarantees to any other party involved in the development of the land.

[¶ 4.] After obtaining the loan, Bauman contacted Ardell Aason (Aason). Bauman advised Aason of the plans to develop the Johnson land, known as Westview Addition. Aason was hired to survey and plat the land. Aason informed Bauman of the many obstacles to overcome in developing the land owned by Johnson. Aason suggested other sites that would be more suitable for development. Although Bauman looked at some of the sites, he ultimately came back to the Johnson land.

[¶ 5.] At the outset, only the Johnson land was included in the development. Bauman approached Johnson and asked him to purchase another tract of land known as the DeVille tract. Johnson indicated that he was not interested in purchasing the land stating that he had all the land he wanted. Subsequently, Bauman decided to purchase the DeVille tract himself, and did so using funds from the development loan. Bauman included the DeVille tract in the development plans without Johnson's approval. Subsequently, the City of Watertown approved the plat of Westview Addition, included within was the DeVille property.

[¶ 6.] Bauman contracted with A.P. & Sons to dig trenches and install sanitary and storm sewers with water and services for twenty-eight hookups for lots in the Westview development. Johnson entered into no contracts with the contractors in-volved in the development. Bauman defaulted in payment for the materials and services provided by A.P. & Sons and the other contractors.

[¶ 7.] A.P. & Sons commenced an action to foreclose its mechanic's lien. A.P. & Sons' mechanic's lien was found to be inferior to the Bank Mortgage. The trial court ordered a sale of the property and a sheriff's sale was held. The Bank purchased the land for the balance owing. Thus, A.P. & Sons received no funds to satisfy their liens for the materials and labor supplied.

[¶ 8.] A.P. & Sons sued Bauman and Johnson claiming they were personally liable. The trial court ruled Johnson was not personally liable. A.P. & Sons appeal the following issue:

> **Whether the trial court erred in finding the property owner, Johnson, not personally liable for the labor and materials furnished in the development of the Westview Addition.**

## STANDARD OF REVIEW

[¶ 9.] This Court reviews the findings of a trial court under a clearly erroneous standard. *Kokesh v. Running,* 2002 SD 126, ¶ 10, 652 N.W.2d 790, 793; *New Era Mining Co. v. Dakota Placers, Inc.,* 1999 SD 153, ¶ 7, 603 N.W.2d 202, 204 (citations omitted).

> Clear error is shown only when, after a review of all the evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.* The trial court's findings of fact are presumed correct and we defer to those findings unless the evidence clearly preponderates against them. *Lewis v. Moorhead,* 522 N.W.2d 1, 3 (S.D.1994)(citing *Cuka v. Jamesville Hutterian Mut. Soc.,* 294 N.W.2d 419, 421 (S.D.1980)). Conclusions of law are reviewed under a de .

novo standard, giving no deference to the circuit court's conclusions of law. *Sherburn v. Patterson Farms, Inc.*, 1999 SD 47, ¶ 4, 593 N.W.2d 414, 416 (citing *City of Colton v. Schwebach*, 1997 SD 4, ¶ 8, 557 N.W.2d 769, 771).

*Id.* (internal quotes omitted).

■ [¶ 10.] We will not seek reasons to reverse the trial court.

It is well settled in this jurisdiction that a trial court's findings of fact and decision are presumed correct and we will not seek reasons to reverse. *Insurance Agents, Inc. v. Zimmerman*, 381 N.W.2d 218 (S.D.1986); *Northern Hills Sanitation v. Board of Com'rs*, 272 N.W.2d 835 (S.D.1978). In action tried to court without jury, this court will not disturb findings unless evidence clearly preponderates against them. *Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259 (S.D. 1985) (citing *Young v. Huffman*, 77 S.D. 254, 90 N.W.2d 401 (1958)); *see also City of Huron v. Jelgerhuis*, 77 S.D. 600, 97 N.W.2d 314 (1959).

*City of Winner v. Bechtold Investments, Inc.*, 488 N.W.2d 416, 418 (S.D.1992).

## DECISION

■ [¶ 11.] This Court has held that "under ordinary circumstances, a property owner will not be held personally liable for work or materials furnished by a subcontractor to a contractor according to a contract between the contractor and subcontractor, where the property owner is not a party to the contract." *Sherman v. Meyer*, 312 N.W.2d 373, 374 (S.D.1981). A.P. & Sons, in an attempt to circumvent this premise, has alleged that a partnership or a joint venture existed between Bauman and Johnson or in the alternative that there was an agency relationship. A.P. & Sons claim the trial court erred in not holding Johnson personally liable for the services and materials provided for in the development of Westview Addition because of the alleged special relationship between Bauman and Johnson.

[¶ 12.] The trial court found no facts supporting A.P. & Sons' proposition that a partnership or joint venture existed between Bauman and Johnson. A partnership is defined as "an association of two or more persons to carry on as co-owners a business for profit." SDCL 48–1–2. This Court has held, "there is no arbitrary test for determining the existence of a partnership, each case must be governed by its own peculiar facts and the existence of the relationship is a question for the trier of fact except in a case where the evidence is conclusive." *Insurance Agents v. Zimmerman*, 381 N.W.2d 218, 220 (S.D.1986) (quoting *Munce v. Munce*, 77 S.D. 594, 96 N.W.2d 661, 663 (S.D.1959)).

[¶ 13.] A joint venture is a less formal partnership. *Stallings v. Owens*, 2002 SD 63, ¶ 10, 646 N.W.2d 272, 277. Generally, a joint venture is entered into for a more limited business purpose and for a more limited time. *Id.* Recently, this Court set forth six elements necessary to establish a joint venture:

(1) an intent to enter into a joint venture;

(2) an agreement, express or implied, among members of a group; and

(3) a common purpose to be carried out by the group;

(4) a joint pecuniary interest in that purpose;

(5) an equal right to a voice in the direction and control of the group; and

(6) a right to share in the profits and a duty to share in any losses.

*Id.* at ¶ 11, 646 N.W.2d at 278 (quoting *Weins v. Sporleder*, 1997 SD 111, ¶ 44, 569 N.W.2d 16, 28). This Court has held that all six elements must be met in order to

establish a joint venture. *Ethan Dairy Products v. Austin*, 448 N.W.2d 226, 228 (S.D.1989).

[¶ 14.] The relationship between Johnson and Bauman cannot be classified as a partnership or a joint venture. Johnson and Bauman entered into an agreement involving land owned by Johnson. Johnson agreed to allow Bauman to develop the land. Although the parties agreed that the land was to be developed, the motivation of Johnson was clearly different from that of Bauman. Johnson's motivation for developing the land was not only to sell the lots for profit, but also to fulfill his parent's wishes. Bauman, on the other hand, wanted the land developed so he could profit by building houses on the lots. It is apparent there was no common purpose being carried out by Johnson and Bauman.

[¶ 15.] It is clear from the transactions entered into by Bauman that Johnson did not have an equal right to control the direction in which the development was going. Johnson specifically stated he did not want to purchase the DeVille tract of land. After Johnson's refusal to purchase the DeVille tract, there was no discussion of Bauman purchasing the DeVille tract for the purpose of including it in the development. In fact, there was no discussion about adding it to the development project in general, regardless of who owned the land. It was Bauman who decided to purchase the land and add it to the development. Even after the purchase there was no discussion of how the DeVille tract would factor into the development of Johnson's land. It is evident that the purchase of the DeVille tract was for the sole benefit of Bauman. Although there was no discussion between Bauman and Johnson concerning sale of lots from the DeVille tract it can be inferred that as the owner, Bauman would have received the profits from any sale of the land. Johnson had no control in the direction the development was taking.

[¶ 16.] Furthermore, the record clearly shows there was no equal right to control. All contracts were negotiated by Bauman. Johnson had no say in who was hired or contracted. Contractors submitted their bids to Bauman. Bauman hired the contractors and all correspondence concerning the project was through Bauman. Johnson had no supervisory role involving the contractors working on the project. Johnson resided in Mexico during the time the project was moving forward.

[¶ 17.] A.P. & Sons claim that Johnson signed a number of documents, including the plat, a proprietor's certificate, and a letter of assurance, evidencing a joint venture. However, Bauman was calling the shots. The documents were not for Johnson to look over and approve. The documents were sent for Johnson to sign so Bauman could move forward with his project. This was merely routine paperwork that had to be completed by the property owner. This does not equal joint venture.

[¶ 18.] We have said, "[c]ourts should be cautious in characterizing the nature of a business relationship without first carefully examining the usage and practice peculiar to the commercial enterprise in question." *Ethan Dairy Products*, 448 N.W.2d at 228. It is not unusual that a property owner hire someone to develop their land. Landowners are not developers. No where is it written that when one develops another's land a joint venture exists.

[¶ 19.] There was no sharing of profits. It is true both Johnson and Bauman would have received a pecuniary benefit, however, such was not a joint pecuni-

ary interest.* Whether or not Bauman constructs five homes or two homes is of no concern to Johnson. Johnson realized no profits from Bauman building houses. In addition, Bauman realized no profit from the sale of the lots. The proceeds from the sale of the lots were to be divided accordingly, Johnson receiving 25% and the other 75% being applied toward the development loan. Johnson received no cut of the profits made by Bauman for constructing a home. It is apparent that there was no sharing of profits and no joint pecuniary benefit in the development of Westview Addition.

[¶ 20.] The evidence supports the finding that no partnership or joint venture existed between Bauman and Johnson.

[¶ 21.] In the alternative A.P. & Sons alleges that Bauman was an agent for Johnson. This argument also fails. "Existence of an agency relationship is a fact specific issue." *Action Mechanical, Inc. v. Deadwood Historic Preservation Comm'n*, 2002 SD 121, ¶ 35, 652 N.W.2d 742.

[¶ 22.] There are two types of agency, actual and ostensible. Actual agency exists when a principal and agent expressly agree to enter into an agency relationship. *Dahl v. Sittner*, 429 N.W.2d 458, 462 (S.D.1988). Ostensible agency is created when a principal by his conduct or lack of ordinary care causes a third party to believe another is acting as his agent. *Id.* "Whether an agency relationship has in fact been created depends upon the relations of the parties as they exist under their agreement or acts." *Id.*

[¶ 23.] A.P. & Sons assert that an actual agency existed between Bauman and Johnson. In *Kasselder v. Kapperman*, this Court set forth factual elements necessary to establish an agency relationship including: (1) manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking. 316 N.W.2d 628, 630 (S.D. 1982). The evidence indicates there was no agency relationship. There was no

---

* The dissent argues that Bauman and Johnson had equal interests in the development project. The dissent notes that Johnson and Bauman had the right to share in the profits of the joint venture. There is no authority which requires the finding of a joint venture if two parties enter into a development project where proceeds will be divided. In *Colorado Performance Corporation v. Mariposa Associates*, the Colorado Court of Appeals stated, "[A]though two or more parties may associate together in a venture, each anticipating an individual profit to himself, no partnership is thereby created because the 'chief characteristic of a joint adventure is a *joint* and not a *several* profit.'" 754 P.2d 401, 406 (Colo.Ct. App.1987). See also *Dority v. Driesel*, 75 Or. App. 180, 706 P.2d 995, 998 (Or.Ct.App.1985)(review denied) (holding "[t]he fact that parties act in concert to achieve some economic objective, while relevant to the inquiry, is not enough to create a joint venture.") From the sale of the lots Johnson was to receive 25% and the remaining 75% was to be applied to the development loan. The dissent argues that the 75% applied to the development loan should be considered Bauman's share of the profits, however, the agreement was that the remaining 75% would be applied to the development loan, which the dissent points out, was secured by Johnson. After the development loan was paid in full, Johnson would receive 100% of the lot price. No money made from the sale of lots was going to end up in Bauman's pocket. The only profit Bauman would receive was from the sale of the homes he built.

> The chief characteristic of a joint adventure is a joint and not several profit. Profits which are severally earned, the parties merely having dealt with the same subject matter, but not for and on behalf of each other, do not meet this requirements of the existence of a joint adventure.

*Dority*, 706 P.2d at 998. It is clear the profits were not to be shared jointly. Both Johnson and Bauman anticipated to profit independently of the other.

agreement that Bauman was taking on the role of an agent. Johnson allowed Bauman to develop the land. Johnson gave no indication to Bauman or other third parties that Bauman was acting on his behalf. Johnson in no way assumed the role of a principal. Bauman was in control of this development. It was Bauman who approached Johnson and persuaded him into developing the land. Bauman was not receiving any compensation from Johnson to develop the land. It was Bauman's desire to develop the land in order to profit from houses he built on the lots. Furthermore, Bauman purchased the DeVille tract of land despite Johnson voicing his dissent. Johnson merely agreed to development. There was no showing of a relationship in this development that showed Bauman was acting as Johnson's agent.

[¶ 24.] The judgment is affirmed.

[¶ 25.] GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur.

[¶ 26.] SABERS, Justice, dissents.

[¶ 27.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

SABERS, Justice (dissenting).

[¶ 28.] The trial court erred in concluding that there was no joint venture agreement. There was a joint venture agreement between Johnson and Bauman. The facts support all six elements necessary to joint venture as follows:

1) Intent to enter into a joint venture.

2) An agreement, express or implied, among members.

3) Common purpose.

4) A joint pecuniary interest in that purpose.

5) An equal right to a voice in the direction and control of the group.

6) A right to share in the profits and a duty to share in any losses.

*1. Intent to enter into a joint venture and; 2. An agreement, express or implied, among members.*

[¶ 29.] According to Johnson's deposition testimony, he and Bauman entered into an agreement whereby Johnson would provide the land and personally guarantee the development loan and Bauman would provide his expertise and services to develop the land. Johnson was to receive 25% of the profit from sale of the developed lots and Bauman was to receive 75% of the profit to pay off his development loan. No agreement was made as to the proceeds from the sale of any houses constructed thereon. This was a typical joint venture where one person, Johnson, provided the capital, and another, Bauman, provided the labor and materials to develop the lots. This is fully supported by Johnson's deposition, his representations to the bank and the engineer, and the behavior of the parties throughout the course of the joint venture.

*3. Common purpose.*

[¶ 30.] Both Johnson and Bauman had the common purpose to develop the land and sell the lots. The majority's assertion that Johnson and Bauman had different motivations is irrelevant. The question is whether the parties had a common purpose, not what their motivation was for pursuing that purpose. Their reasons for doing so are immaterial to this discussion. The majority attempts to differentiate the motives of the parties by referring to the fact that Bauman eventually wished to build houses on the lot. While this is true, the joint venture agreement between Johnson and Bauman only dealt with the

issues of development and sale of the lots. The liability at issue pertains to the costs of developing the land. The fact that Bauman or some other contractor might eventually build houses on the lots is also irrelevant to determine whether there was a joint venture for the purpose of developing the land.

### 4. A joint pecuniary interest in that purpose.

[¶ 31.] Upon sale of each lot, Johnson received 25% of the profit and Bauman received 75% of the profit by having it applied directly to his development loan. Neither party to the joint venture agreement would have profited but for the agreement to develop the tract. The pecuniary interest of both parties was directly tied to development of the land. This is sufficient to show a joint pecuniary interest in their common purpose.

### 5. An equal right to a voice in the direction and control of the group.

[¶ 32.] Johnson had an equal right to control the direction of the development. First, Bauman could not develop the land without Johnson's permission. Second, as the majority states, the documents signed by Johnson needed to be signed "so Bauman could move forward with his project." This was paperwork that "had to be completed by the property owner" in order for development to take place. Third, when Johnson declined Bauman's proposal to purchase and include the DeVille tract, Bauman's going forward with that purchase on his own does not eliminate the joint venture. When Bauman went beyond the bounds of the agreement, it may have changed who was liable for debts arising from the DeVille tract, but it did not change the existence of the joint venture agreement.

[¶ 33.] Likewise, the fact that Bauman may receive some of the benefits of developing the DeVille tract does not preclude a finding of joint venture as to Johnson's land. First, the money used to purchase the DeVille tract was drawn from the development loan secured by Johnson. Second, at least three of the platted lots encompassed land on both the Johnson and DeVille tracts. Johnson would have been entitled to profits from the sale of those portions of his land that were combined with the DeVille land to make up those three lots, despite Bauman's possible breach of the joint venture agreement. Third, Johnson states in his deposition that there had not been any discussion regarding what his share of the profits would have been from those lots. The majority errs when it states as settled fact that Johnson would not have received any profits from development of the DeVille tract in connection with the Johnson land. In fact, Johnson signed the plat and the letter that combined the two parcels.

[¶ 34.] Although he disputes it now, Johnson did take an active role in the development of the property. His own words indicate that he believed he had control in this joint venture. For example, on May 15, 1998, Johnson signed a letter to the Watertown City Engineer which began with the sentence, "I Earle D. Johnson, owner/ *developer* of the above described parcel agree to *develop* this property ..." (emphasis supplied). On October 23, 2000, Johnson writes an email to the engineer stating, "I do not condone [Bauman's] conduct and will appreciate some developers you may recommend if it comes to that," indicating that he is willing to replace Bauman and continue the development. On October 27, 2000, Johnson writes another email to the engineer stating, "[i]t is quite apparent to me that Bob Bauman can no longer have anything to do with the project ... I would appreciate

your thoughts as to who might be capable of replacing Bob and how you recommend to proceed." On November 2, 2000, he writes yet another email to the engineer stating, "I feel it would be in all of our best interest at this time to not inform Bob *of my decision to remove [him]* from the Westview Acres project ..." Finally, on the same day, Johnson sends another email to the engineer stating, "[a]s I mentioned over the telephone, Bob Bauman is no longer associated with Westview Acres ..." If Johnson had no right to control in this joint venture, why would he think he could unilaterally remove Bauman as the developer and replace him with another developer?

[¶ 35.] It is true that the contractors dealt primarily with Bauman. However, this arrangement was per Johnson and Bauman's joint venture agreement that Bauman would do all of the "leg work" since Johnson resided in Colorado and in Mexico. Johnson retained interest and control in the development as shown by the facts that he 1) was involved in negotiations with the bank 2) took part in platting the property (a necessary element of "developing" land) and 3) requested that the engineer keep him up to date on the progress of development by sending him pictures. The fact that Johnson chose to delegate the authority to enter into the contracts and do the other leg work necessary for development does not detract from the fact that there was a joint venture agreement between Johnson and Bauman.

*6. A right to share in the profits and a duty to share in any losses.*

[¶ 36.] The parties had a right to share in the profits of this joint venture. Neither of them would profit until the lots were sold. Once sold, the parties agreed that 75% of the profit would be paid to-ward the development loan in Bauman's name and 25% of the profit would be paid to Johnson. There is no requirement that profits be shared equally, nor is there a prohibition against payment against a loan rather than directly to the individual holding the loan. This joint venture agreement is sufficient to show a right to share in the profits and a duty to share in the losses.

[¶ 37.] The development loan was taken in Bauman's name and guaranteed by Johnson. Default on that loan left them both responsible for payment. Likewise, both had a duty to share in the losses.

[¶ 38.] It is unfortunate for Johnson that his business associate was incapable of performing his end of the joint venture agreement, but that does not justify a determination that no joint venture agreement existed or denying A.P. & Sons payment for its work. The trial court erred in so concluding and we should reverse.