2005 SD 18

John Carl HARRIMAN a/k/a Jack Harriman, Plaintiff and Appellant,

v.

UNITED DOMINION INDUSTRIES, INC.; United Dominion Industries, Limited; United Dominion Holdings, Inc.; Feterl Mfg. Co.; Core Industries, Inc. and SPX, Defendants and Appellees.

Nos. 23142, 23143.

Supreme Court of South Dakota.

Considered on Briefs Nov. 15, 2004.

Decided Feb. 2, 2005.

Rehearing Denied March 8, 2005.

Michael E. Unke, Salem, South Dakota, Attorney for plaintiff and appellant.

Michael L. Luce, Cheryle Wiedmeier Gering of Davenport, Evans, Hurwitz and Smith, Sioux Falls, South Dakota, Attorneys for defendants and appellees.

GILBERTSON, Chief Justice.

[¶ 1.] John Carl Harriman entered into an oral agreement to sell service bodies for Feterl Manufacturing. The duration of the contract was never discussed by the parties. United Dominion Industries, Inc. (UDI) purchased Feterl Manufacturing and sought to reduce Harriman's commission structure. Dissatisfied with UDI's

final commission proposal, Harriman resigned and brought suit alleging a joint venture between the parties, the wrongful termination of a permanent employment contract, fraud and deceit. At a jury trial on the matter, Harriman prevailed on his claim of wrongful termination of a permanent employment contract and was awarded past and future damages. The verdict was reversed on UDI's motion for judgment notwithstanding the verdict. The trial court held the agreement between Harriman and Feterl Manufacturing was within the statute of frauds, and Harriman's claim failed for lack of a writing containing essential terms and signed by Feterl Manufacturing. Affirmed.

## FACTS AND PROCEDURE

[¶ 2.] In 1988, John Carl Harriman (Harriman) began negotiating with United Dominion Industries, Inc.'s (UDI) predecessor, Feterl Manufacturing Company (Feterl Manufacturing), to produce and sell a line of service bodies.[1] Harriman proposed Feterl Manufacturing would manufacture the service bodies based on detailed line drawings, plans and photos of two models provided by Harriman. Harriman would be responsible for product development and all sales, and would be compensated on a commission basis. After several meetings, Feterl Manufacturing and Harriman entered into an oral agreement on August 10, 1988 and at that time Harriman filled out an employment application.

[¶ 3.] The terms of the agreement between Harriman and Feterl Manufacturing were never fully developed or reduced to writing. The oral agreement called for Harriman to be paid commissions on the difference between the price each unit was

---

1. A service body is intended to be mounted onto a truck chassis, and generally includes

some or all of the following components: a crane, compressor and a tool compartment.

sold for and the net sales price.[2] Harriman began work on August 22, 1988. From August 22, 1988, until 1997, Harriman was the sales representative for service bodies. He also contributed ideas and expertise in designing several new service body models. He also participated in Feterl Manufacturing's health, dental and retirement plans, and was listed as an employee for Internal Revenue Service purposes.

[¶ 4.] The duration of the employment agreement was never discussed by the parties. Several documents in Feterl Manufacturing's possession, including W–2 statements and accounting department records, detailed some of the terms of the agreement including how the commission rate was structured. However, none of the documents contained any reference to the duration of the employment agreement.

[¶ 5.] In July of 1997 a series of corporate changes began in which Feterl Manufacturing was sold first to UDI, then a merger between UDI and SPX was executed, and finally the company was acquired by Feterl Acquisition Corporation n/k/a Feterl Manufacturing Corporation. At each successive sale, Harriman's commission structure was altered. The final alteration of the commission structure occurred in December 1999, and resulted in Harriman resigning from Feterl Manufacturing in February 2000.

[¶ 6.] On February 18, 2000, Harriman filed suit against UDI.[3] In his complaint, Harriman alleged a joint venture between the parties, the wrongful termination of a permanent employment contract, fraud and deceit. In its answer UDI contended Harriman was an employee-at-will subject to discharge at any time, and that Harriman's claim was barred by the statute of frauds.

[¶ 7.] On May 21, 2001, UDI moved for summary judgment based on Harriman's status as an employee-at-will who was terminable at any time, and that the statute of frauds barred recovery. UDI's motion was denied by the trial court. It its opinion letter, the court noted that the denial was necessary as factual disputes relating to whether or not the employment agreement fell under the statute of frauds needed to be fully developed and determined at trial.

[¶ 8.] Harriman moved for summary judgment on the issues of (1) whether there was an initial contract between Feterl Manufacturing and Harriman separate and apart from any employer/employee relationship and (2) fraud and breach of contract. The trial court, the Honorable Boyd L. McMurchie presiding, granted the motion for summary judgment on the issue of the separate contract. Judge McMurchie denied the motion as to the claim of fraud and breach of contract.

[¶ 9.] Trial on the matter commenced August 18, 2003, before the Honorable David R. Gienapp. The trial court instructed the jury that Harriman had to prove that the contract entered into by the

---

**2.** The net sales price was computed at actual cost of materials plus ten percent, plus inbound freight, actual cost of direct labor, plus overhead, plus thirty-five percent office overhead and profit. In addition, Harriman was to receive fifty percent of the chassis mark up and fifty percent of the profit on parts.

**3.** Harriman's final amended complaint was filed against UDI, Inc., United Dominion Industries, Limited, United Dominion Holdings, Inc., Feterl Mfg. Co., Core Industries, Inc., SPX, and Feterl Acquisition Corp., n/k/a Feterl Manufacturing Corp. The defendants were related through a complex corporate structure, and in the event a verdict was returned in favor of Harriman the jury was called upon to determine which of the corporate entities were liable for damages.

parties was either an agreement to enter into a permanent employment contract, or an agreement to enter into a joint venture. To prove a joint venture, the trial court instructed the jury that Harriman had to establish all six of the following:

The Plaintiff has the burden of proving each of the elements of a joint venture which are:

1) an intent to enter into a joint venture,

2) an agreement, express or implied, among members of a group,

3) a common purpose to be carried out by the group,

4) a joint pecuniary interest in that purpose,

5) an equal right to a voice in the direction and control of the group, and

6) a right to share in the profit and a duty to share in the losses.

If the Plaintiff fails to prove one or more of these elements, your verdict must be for the Defendants on the joint venture claim.

On the issue of a joint venture, the jury found five of the six elements were present, but not the fifth element of "an equal right to a voice in the direction and control of the group." Therefore the jury found no joint venture existed. The jury returned a verdict for Harriman against UDI on the issue of breach of a permanent employment contract, and awarded past damages of $586,359.43 and future damages of $121,240. UDI moved for directed verdict, which was denied.

[¶ 10.] UDI filed a motion for judgment notwithstanding the verdict (j.n.o.v.) contending the contract claim was barred by the statute of frauds. In its memorandum opinion, the trial court noted the issue was raised by UDI's pre-trial motion for summary judgment, but genuine issues of material fact were in dispute prior to trial that required denying UDI's motion at that time. The trial court noted that there was no dispute between the parties that the original agreement between Harriman and Feterl Manufacturing was to enter into an oral contract. The trial court determined there was insufficient evidence presented at trial to support the jury's verdict that the contract was for lifetime or permanent employment. Instead, the evidence indicated the contract was tied to other contingencies that extended the period of the contract beyond one year. The trial court concluded that the contract fell within the statute of frauds. Due to the absence of a writing signed by UDI or its predecessors denoting the duration of the contract, Harriman's claim was barred by the statute of frauds. UDI's motion for j.n.o.v. was granted.

[¶ 11.] Harriman appealed two issues:

1. Whether the trial court erred when it granted UDI's motion for judgment notwithstanding the verdict on UDI's assertion that the statute of frauds, SDCL 53–8–2(1), bars Harriman's contract claim.

2. Whether the trial court erred when it instructed the jury that all six elements of a joint venture must exist in order for Harriman to prevail on that issue.

By notice of review, UDI appealed the following:

3. Whether UDI was the employer of Harriman;

4. Whether Harriman was an employee-at-will;

5. Whether Harriman is estopped from claiming he was an employee; and

6. Whether Harriman proved all of the elements of a contract.

## STANDARD OF REVIEW

[¶ 12.] This Court's standard of review on motion for judgment notwith-

standing the verdict (j.n.o.v.) is well settled. *Bridge v. Karl's Inc.*, 538 N.W.2d 521, 523 (S.D.1995) (citation omitted). "We review the testimony and evidence in a light most favorable to the verdict or the nonmoving party, 'then without weighing the evidence [we] must decide if there is evidence which would have supported or did support a verdict[.]'" *Gilkyson v. Wheelchair Exp., Inc.*, 1998 SD 45, ¶ 7, 579 N.W.2d 1, 3 (citing *Bland v. Davison County*, 1997 SD 92, ¶ 26, 566 N.W.2d 452, 460 (quoting *Sabag v. Continental*, 374 N.W.2d 349, 355 (S.D.1985))). We review the trial court's ruling on j.n.o.v. by the abuse of discretion standard. *Id.* (citation omitted). "The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse." *Veeder v. Kennedy*, 1999 SD 23, ¶ 25, 589 N.W.2d 610, 617 (quoting *Border States Paving, Inc., v. S.D. Dep't of Transp.*, 1998 SD 21, ¶ 10, 574 N.W.2d 898, 901) (citations omitted).

 [¶ 13.] "We review jury instructions as a whole, and error is not reversible unless prejudicial." *Burhenn v. Dennis Supply Co.*, 2004 SD 91, ¶ 11, 685 N.W.2d 778, 782 (citing *Buxcel v. First Fidelity Bank*, 1999 SD 126, ¶ 13, 601 N.W.2d 593, 596). The party contending error has the burden of demonstrating the instruction given was in error and that the error was prejudicial. *Knudson v. Hess*, 1996 SD 137, ¶ 6, 556 N.W.2d 73, 75 (citing

---

**4.** SDCL 53–8–2 also precludes enforcement of other types of agreements absent a writing, including an agreement in contemplation of marriage, an agreement for the sale of real estate or an interest in real estate longer than one year in duration, and certain types of agreements for the loan of money or for an extension of credit.

**5.** The underlying rationale for the statute of frauds may be found in the purposes for which the "Act for Prevention of Frauds and Perjuries" was adopted by the English Parlia-

---

*Sybesma v. Sybesma*, 534 N.W.2d 355, 359 (S.D.1995)) (citation omitted). "Prejudicial error is that which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 426 (S.D.1994) (citing *State v. Michalek*, 407 N.W.2d 815, 818 (S.D.1987)).

## ANALYSIS AND DECISION

[¶ 14.] **1. Whether the trial court erred when it granted UDI's motion for j.n.o.v. on UDI's assertion that the statute of frauds, SDCL 53–8–2(1), bars Harriman's contract claim of permanent employment.**

 [¶ 15.] The statute of frauds is codified at SDCL 53–8–2. It provides in relevant part:

The following contracts are not enforceable by action unless the contract or some memorandum thereof is in writing and subscribed by the party to be charged or his agent, as authorized in writing:

(1) An agreement that by its terms is not to be performed within a year from the making thereof[.] [4]

SDCL 53–8–2(1). The role of the statute of frauds is evidentiary in nature, and serves to remove uncertainty by requiring "written evidence of an enforceable obligation." [5] *Jacobson v. Gulbransen*, 2001

---

ment in the late 1600s. *Kiely v. St. Germain*, 670 P.2d 764, 768 (Co.1983) (citing An Act for Prevention of Fraud and Perjuries, 29 Car. 2, c. 3 (1677)). The statute was enacted to combat the perpetration of fraud via perjury. *Id.* Widespread perjury became a significant problem when English common law was changed to no longer preclude the enforcement of oral contracts. *C.R. Klewin, Inc. v. Flagship Properties, Inc.*, 220 Conn. 569, 600 A.2d 772, 775 (1991) (citations omitted). At that time, English law allowed juries to decide a case based on their own personal

SD 33, ¶ 26, 623 N.W.2d 84, 90 (quoting *Sabhari v. Sapari,* 1998 SD 35, 576 N.W.2d 886, 893, n. 9). SDCL 58–8–2(1) does not "prohibit the making of a contract that by its terms is not to be performed within one year, but merely makes such contract invalid unless reduced to writing." *Trovese v. O'Meara,* 493 N.W.2d 221, 222 (S.D.1992) (quoting *Brown v. Wisconsin Granite Co.,* 47 S.D. 635, 639, 201 N.W. 555, 556 (1924)).

■ [¶ 16.] Harriman contended that the contract entered into by the parties was for permanent employment. Harriman testified that he believed he had a job at Feterl Manufacturing up until he elected to retire or the service body line was no longer profitable. In his deposition, Harriman suggested his retirement would occur at age sixty-five. At trial he testified that he might have elected to continue to work until age seventy-five. Harriman gave his year of birth at his deposition as 1940, suggesting a contract of either seventeen or twenty-seven years in duration.

[¶ 17.] Leon Feterl, the owner of Feterl Manufacturing in 1988, testified at trial that the agreement between Feterl Manufacturing and Harriman was not permanent in nature, and that either party could have elected to terminate the relationship at any time. Feterl testified that the arrangement would have continued as long as it was profitable for Feterl Manufacturing and as long as Harriman liked the arrangement.

[¶ 18.] Harriman argued that these statements can be interpreted to mean that a contract for permanent or lifetime employment was intended by the parties. Harriman argued that because it was possible for Harriman to have died prior to the end of the first year of the contract, it was possible for the contract to be completed within one year of its making. Therefore, the contract would not fall within the statute of frauds.

[¶ 19.] There is no question that the parties entered into an oral contract. However, no duration or term was ever discussed at the initial meetings between Harriman and representatives of Feterl Manufacturing. Harriman was able to introduce several writings at trial that conclusively showed the commission structure, but no writings were introduced that showed the duration of the employment contract.

[¶ 20.] Even when viewed in the light most favorable to Harriman as the non-moving party, it is clear from the record that the parties did not intend a permanent or lifetime contract. Rather, the parties intended a contract of some unspecified term of years tied to contingencies other than Harriman's lifetime. Because the contract was intended to be more than one year in duration, that is until Feterl Manufacturing or Harriman no longer liked the arrangement, or Harriman elected to retire, it falls within the statute of frauds. Lacking a writing signed by UDI or Feterl Manufacturing that contained the duration term, Harriman's claim is barred by the statute of frauds.

[¶ 21.] **2. Whether the trial court erred when it instructed the jury that**

knowledge rather than on the evidence introduced at trial. *Id.* The statute of frauds placed a limitation on this discretion by requiring a writing signed by the party against whom enforcement was sought. *Id.*

At least three justifications are advanced for the continued use of the statute of frauds in modern times (1) as an evidentiary function to combat perjury, (2) for its cautionary effect of impressing upon the parties the significance of their agreement, and (3) as a channeling device that distinguishes enforceable contracts from unenforceable contracts. *Wior v. Anchor Industries, Inc.,* 669 N.E.2d 172, 174 (Ind.1996) (citation omitted).

**all six elements of a joint venture must exist in order for Harriman to prevail on that issue.**

[¶ 22.] We recently set forth six elements necessary to establish a joint venture. *A.P. & Sons Constr. v. Johnson,* 2003 SD 13, ¶ 13, 657 N.W.2d 292, 295. These six elements include:

(1) an intent to enter into a joint venture;

(2) an agreement, express or implied, among members of the group; and

(3) a common purpose to be carried out by the group;

(4) a joint pecuniary interest in that purpose;

(5) an equal right to a voice in the direction and control of the group; and

(6) a right to share in the profits and a duty to share in any losses.

*A.P. & Sons Constr.,* 2003 SD 13, ¶ 13, 657 N.W.2d at 295 (citing *Stallings v. Owens,* 2002 SD 63, ¶ 11, 646 N.W.2d 272, 278) (quoting *Weins v. Sporleder,* 1997 SD 111, ¶ 44, 569 N.W.2d 16, 28). All six elements must be met in order to establish the existence of a joint venture. *Id.* (citing *Ethan Dairy Products v. Austin,* 448 N.W.2d 226, 228 (S.D.1989)).

[¶ 23.] Harriman contends the trial court erred when it instructed the jury that all six elements had to exist in order to establish a joint venture. Harriman cites *Stallings,* 2002 SD 63, ¶ 11, 646 N.W.2d at 277 for the proposition that the trial court should have instructed that "most, if not all" of the elements had to be established. The language in *Stallings* does imply that all six elements need not be established. However, our holding in *A.P. & Sons Constr.* makes it clear that all six elements must be satisfied in order to

establish a joint venture. 2003 SD 13, ¶ 13, 657 N.W.2d at 295 (citing *Ethan Dairy Products v. Austin,* 448 N.W.2d 226, 228 (S.D.1989) (citing 48A CJS Joint Ventures § 10 (1981) (stating "usually all of these elements must be present for a joint venture to exist; but no one of the elements essential to the creation of a joint venture is alone sufficient to establish such."))).

[¶ 24.] The trial court instructed the jury correctly on the six required elements of a joint venture, specifying that all six elements must exist. The trial court did not err, as it correctly stated the law for the jury. Absent error in the trial court's instructions to the jury there can be no prejudicial error to Harriman.

[¶ 25.] It is not necessary to reach the issues appealed by UDI given our holdings in Issue 1 and Issue 2. Affirmed.

[¶ 26.] KONENKAMP and MEIERHENRY, Justices, concur.

[¶ 27.] ZINTER, Justice, concurs with a writing.

[¶ 28.] SABERS, Justice, dissents.

ZINTER, Justice (concurring).

[¶ 29.] I concur because, by Harriman's own admission, the oral agreement was to be performed over a period of time exceeding one year. Therefore, it was unenforceable under the statute of frauds.

[¶ 30.] Harriman relies on authorities holding that such agreements are outside the statute of frauds because they *could* be performed in less than one year if death or some other contingency arose. However, that was not the nature of Harriman's claim. Harriman testified that the agreement was to continue until retirement [6] or

---

6. UDI asserts that Harriman testified (in a deposition) that the agreement was to last

until his retirement. Although Harriman disputes UDI's assertion with respect to trial

until the business was no longer profitable. Accordingly, Harriman's expert witness proffered a damage calculation that involved ongoing damages for up to twenty-nine years, or until 2029. Similarly, Harriman's counsel argued to the jury that their expert witness "testified that he made computations for twenty-nine years." Finally, the jury actually awarded damages sustained from March 19, 2000 through the 2003 trial, and for further damages to be incurred in the future. Thus, there can be no dispute that the agreement sued upon, however denominated, was "not to be performed within a year from the making thereof; ..." within the meaning of SDCL 53–8–2(1).

[¶ 31.] In *Brown v. Wisconsin Granite Co.*, 47 S.D. 635, 640, 201 N.W. 555, 557 (1924), this Court did not permit a terminated employee "to recover for the time he did not work, and the bonus he claimed would have been due him at the end of [a one] year [oral contract because] the alleged contract [was] invalid under the statute [of frauds]. ..." Similarly, other courts recognize that "[s]ince the parties understood [that the contract would not terminate] within one year, the Statute of Frauds required the agreement to be in writing." *Wior v. Anchor Industries, Inc.*, 669 N.E.2d 172, 174–175 (Ind. 1996) (holding that a contract of employment until retirement was within the statute of frauds even though death or other contingency could end the contract earlier than one year). *See also Gebhard v. GAF Corp.*, 59 F.R.D. 504, 506 (D.D.C.1973) (guaranteeing employment until age 65 brought purported contract within statute of frauds); *Gilliland v. Allstate Insurance Co.*, 69 Ill. App.3d 630, 26 Ill.Dec. 444, 388 N.E.2d 68 (1979) (holding an oral agreement to employ an individual until retirement fell

within the statute of frauds and was unenforceable); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991) (holding that understanding to be employed for another eight to ten years until retirement was within the statute of frauds and unenforceable); *Molder v. Southwestern Bell Telephone Co.*, 665 S.W.2d 175, 177 (Tex.App.1983) (holding employee's belief that he was contractually entitled to work for employer until retirement at age 65 meant that the contract fell within the statute of frauds).

[¶ 32.] The Indiana Supreme Court noted that a contrary ruling would "seriously undermine" the statute of frauds. *Wior*, 669 N.E.2d at 175. In fact,

[w]ere we to rule otherwise, the Statute of Frauds' continued vitality in service contracts would be substantially eroded. Under the [contrary] analysis, any person with a service agreement intended to span a long period of time could avoid the writing requirement of the Statute of Frauds, since death could always occur within one year. Such a holding would seriously undermine the Statute of Frauds' efficacy in encouraging written contracts and preventing fraud and perjury.

*Id.*

[¶ 33.] For these reasons, the trial court should be affirmed.

SABERS, Justice (dissenting).

[¶ 34.] The majority opinion and special writing clearly establish that the agreement between Feterl Manufacturing Company and its successors and Harriman was within the statute of frauds because it could not be performed within one year. However, neither writing can see the for-

testimony, this dispute is of no consequence because the record reflects that in either

event, the contract was to be performed over a period of time exceeding one year.

est for the trees and permits the statute of frauds to produce a fraud upon Harriman.

[¶ 35.] The defect in both writings is that they ignore the agreement and the facts, being blinded as they are by the technicalities of the statute of frauds. The facts are that: Harriman and Feterl Manufacturing Company operated for years under the agreement that the writings ignore. As documented by Feterl Manufacturing Company's treasurer, Darrell Streff, the agreement was set forth in Exhibit 15, a copy of which is attached. The agreement speaks for itself and was subscribed by the party to be charged, and is binding on its successors.

[¶ 36.] In addition, every paycheck ever written by Feterl Manufacturing Company and its successors was a document or agreement in writing, signed by the party to be charged. Incredibly, the trial court was correct in all of its rulings except on this same point:

> In light of my ruling on the statute of frauds issue it is not absolutely necessary that I address the other issues raised by the Defendant [(UDI)], but anticipating a Supreme Court review of this case along with a possible notice of

review submitted by the Defendants I will briefly address those issues and initially indicate that I would *deny* Defendant's position as to the other six claimed reasons.

(emphasis added). We must look at the trees to see the forest. We must not be blinded by the technicalities of the statute of frauds, and permit them to produce a fraud. *See Jacobson v. Gulbransen,* 2001 SD 33, ¶ 26, 623 N.W.2d 84, 90 ("The statute of frauds will not, however, be used to work an injustice."). We need to simply review the facts for what they are.

[¶ 37.] The facts speak for themselves and clearly show that the agreement was substantially performed year after year after year. Every paycheck ever written by Feterl Manufacturing Company and its successors was a document or agreement "in writing and subscribed by the party to be charged." SDCL 53–8–2. Therefore, the statute of frauds was complied with in every way and it was error to vacate the judgment in favor of Harriman for $586,359 in damages and $121,240 in future damages. We should reverse and remand and require reinstatement.

Exh. 15

**Feterl MFG. CO.**

P.O. Box 998/411 Center Ave. West SALEM, SOUTH DAKOTA 57058

subsidiary of **CORE** Industries Inc.

TELEFAX: (605) 425-2183
PHONE: (605) 425-2206

January 26, 1995

Dave Zimmer, President
Core Industries Inc.
500 North Woodward Ave.
Bloomfield Hills, MI 48303-2000

Dear Dave:

Ron said you needed a breakdown of Jack Harriman's earnings for 1994.

| | |
|---|---|
| Base Salary | $ 18,314.16 |
| Commissions on Sales of $1,178,843 | 88,596.87 |
| | $106,911.03 |

Our agreement with Jack is very unique, each sale stands by itself. We determine the Net Sell Price for each unit and then split the difference between what the unit was actually sold for less our Net Sell Price.

The Net Sell Price includes: Actual cost of material plus 10% plus inbound freight, actual cost of direct labor plus overhead plus 35% office overhead and profit, plus a flat $2,500.00 charge per unit for selling overhead.

If there are any other questions pertaining to this, please let me know.

Sincerely

Feterl Mfg. Co.

Darrell F. Streff, Treas.

1