#24172-a-SLZ

**2008 SD 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

FIN-AG, INC.,                                          Plaintiff and Appellant,

  v.

CIMPL'S, INC.,                                        Defendant and Appellee,

  and

DACOTAH BANK,                                   Defendant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE ARTHUR L. RUSCH
Judge

\* \* \* \*

JASON W. SHANKS of
May & Johnson, PC
Sioux Falls, South Dakota

and

JONATHAN K. VAN PATTEN
Vermillion, South Dakota                    Attorneys for appellant.

MICHAEL J. SCHAFFER
PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota                    Attorneys for appellees.

\* \* \* \*

ARGUED JANUARY 8, 2007

OPINION FILED **06/18/08**

#24172

ZINTER, Justice

[¶1.]    This appeal arises from an action for conversion by Fin-Ag, Inc. against Cimpl's, Inc. Fin-Ag alleges that it had a security interest in cattle Cimpl's purchased, and that Cimpl's converted Fin-Ag's collateral by failing to remit cattle sale proceeds to Fin-Ag. On cross-motions for summary judgment, the circuit court granted summary judgment to each party according to the timing of and participants in each sale. Fin-Ag appeals adverse rulings on those sales in which the circuit court concluded that Cimpl's took free of Fin-Ag's security interest. The principal issue we address is the nature of the protection provided to buyers of farm products under the Food Security Act (FSA), 7 USC § 1631(1985). We affirm.

## I.

[¶2.]    On June 27, 2002, Fin-Ag entered into an Agricultural Security Agreement (ASA) with Berwald Brothers,[1] Calvin Berwald, Michael Berwald, Kimberly Berwald, and Sokota Dairy, LLC (collectively Berwalds). The ASA granted Fin-Ag a security interest in collateral owned by Berwalds, including farm products (cattle). Under the ASA, all proceeds of cattle sales were to be jointly payable to Berwalds and Fin-Ag. The ASA also provided that, except for inventory, no provision of the ASA could be interpreted to authorize any sale of collateral unless authorized by Fin-Ag in writing.

[¶3.]    On July 2, 2002, Fin-Ag filed a Uniform Commercial Code (UCC) financing statement with the Secretary of State. The parties agree that this

---

1.    Berwald Brothers is a general partnership, including Calvin and Michael Berwald as general partners.

qualified as an "effective financing statement" (EFS) under the FSA. The UCC financing statement listed Berwalds[2] as debtors and identified all livestock and farm products as collateral. The EFS portion described the covered farm products as dairy cattle and milk.

[¶4.] On August 26, 2002, Fin-Ag and Berwalds executed a promissory note in the amount of $460,000, and on January 8, 2003, they executed a second promissory note in the amount of $4,110,000. The notes were secured by the cattle, as well as the other property described in the ASA. On August 23, 2004, Berwalds defaulted on the promissory notes and filed a Chapter 11 bankruptcy. Berwalds ultimately filed an amended plan of reorganization, which required Berwalds to pay Fin-Ag the entire balance of its loans plus interest, costs, and Fin-Ag's attorney fees. This dispute arose as a result of several pre-default cattle purchases by Cimpl's.

[¶5.] Cimpl's is a meat packing plant that purchases cattle for slaughter in the ordinary course of business. It was registered with the South Dakota Secretary of State's central filing system for effective financing statements. Therefore, each month Cimpl's received portions of the master list identifying Fin-Ag's debtors and collateral subject to security interests.

[¶6.] When Cimpl's purchased cattle, the person delivering the cattle signed a "Cattle Receiving Ticket" showing the delivery information. The receiving ticket

---

2. Although Berwald Brothers executed the ASA, the financing statement and EFS refer to "Berwald Partnership" with no reference to "Berwald Brothers." This discrepancy was not raised as an issue on appeal.

specifically identified the seller, as well as the number, condition, and weight of the cattle. The cattle at issue were delivered by Austin, Calvin, Michael, or Arlen Berwald. Cimpl's was informed the cattle were being sold by "C&M Dairy."[3] Cimpl's was not aware that C&M Dairy was a d.b.a. used by Calvin and Michael Berwald to buy and sell cattle.[4]

---

3.     Almost identical commission merchant purchases and sales under the name C&M Dairy were also being made through Stockmen's Livestock Market, Inc., Pipestone Livestock Auction Market, Inc., South Dakota Livestock Sales of Watertown, Inc., and Watertown Livestock Auction, Inc. *See* Fin-Ag, Inc. v. Pipestone Livestock Auction Market, Inc. and Fin-Ag, Inc. v. South Dakota Livestock Sales of Watertown, Inc., 2008 SD 48, __NW2d __; and Fin-Ag, Inc. v. Watertown Livestock Auction, Inc., 2008 SD 49, __NW2d __.

4.     Berwalds had provided information to Cimpl's suggesting that Arlen, who was not one of Fin-Ag's debtors, was the owner of the business C&M Dairy. In September 2003, in an effort to obtain information regarding the seller, Cimpl's sent C&M Dairy a check for cattle and enclosed a postcard requesting additional payee information. The card was returned to Cimpl's, listing Arlen Berwald as the contact person for the C&M Dairy business, along with Arlen's address and phone number. Arlen's social security number was provided as the business's tax identification number. Neither that address nor that social security number matched any of those on Fin-Ag's EFS.

    The record does not support the dissent's factual assertion that buyers "knew they were dealing with Berwalds fronting as C&M Dairy," *see infra* ¶67 n19. If anything, the record suggests it was Fin-Ag that was aware that Berwalds were conducting their cattle business under the d.b.a. C&M Dairy. *See infra* n7 (highlighting Fin-Ag's answer in a prior lawsuit wherein it admitted that "Berwalds, d/b/a C&M Dairy owned and operated a dairy operation in Toronto, South Dakota"). In any event, the dissent's assertion is legally irrelevant because:

> . . . a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, *even though* the security interest is perfected; and *the buyer knows of the existence of such interest*.

    7 USC § 1631(d) (emphasis added). *See also infra* ¶17.

[¶7.] Because C&M Dairy was the only entity identified as the seller at the time of sale, Cimpl's reviewed the most recent master list to determine if C&M Dairy was subject to an EFS. C&M Dairy was not on the master list, and therefore Fin-Ag was not made a co-payee on the proceeds checks. Instead, Cimpl's issued the checks to C&M Dairy in care of Arlen Berwald.[5] Ultimately, the sales proceeds were not remitted to Fin-Ag by C&M Dairy, Arlen Berwald or the Berwalds.[6] The sales at issue involve approximately 650 head of cattle sold between April 13, 2003, and July 23, 2004, for $283,973.55.[7]

[¶8.] On April 13, 2005, Fin-Ag commenced this action against Cimpl's. Fin-Ag alleged that Cimpl's converted Fin-Ag's collateral by not remitting the proceeds

---

5.   Arlen Berwald is the father of Calvin and Michael Berwald. Arlen made nine of the 128 deliveries of cattle in this case. Arlen was not a signatory to the ASA.

6.   Cal Berwald was a Fin-Ag debtor. With two exceptions that are not relevant to this appeal, when Cal Berwald Dairy was identified as the seller, Cimpl's listed Fin-Ag as a co-payee on the proceeds checks.

7.   Fin-Ag claims it was not aware Berwalds were selling cattle to Cimpl's without permission under the name C&M Dairy until August 20, 2004. However, in July 2002, Calvin Berwald submitted a request for disbursement of funds to Fin-Ag in order to purchase cattle. The request was supported by an attached yard receipt from Watertown Livestock Auction, Inc. as proof of the purchase. The yard receipt listed "C-M Dairy" as the purchaser. Fin-Ag subsequently disbursed funds for C&M Dairy's purchases. Additionally, in October 2002, R&J Van Beek, LLC started a lawsuit against Berwalds, "d/b/a C&M Dairy" and Fin-Ag. The lawsuit arose when Calvin and Michael Berwald, d/b/a C&M Dairy, sold 150 head of cattle to R&J Van Beek. The purchase order, incorporated into the complaint, specifically listed C&M Dairy as the seller. In its answer in that lawsuit, Fin-Ag admitted that Berwalds, d/b/a C&M Dairy, owned and operated a dairy operation in Toronto, South Dakota. However, Fin-Ag never amended its financing statement/EFS to include C&M Dairy as a debtor.

to Fin-Ag or listing Fin-Ag as a co-payee on the checks. The parties filed cross-motions for summary judgment. The circuit court entered summary judgment in favor of Fin-Ag in the amount of $3,298.14 for proceeds Cimpl's remitted to Cal Berwald Dairy because Cal Berwald was on the master list. The court granted summary judgment in favor of Cimpl's for sales occurring prior to April 13, 2003, as they were barred by the statute of limitations in SDCL 57A-9-609.1. These two rulings have not been appealed. The court finally granted summary judgment in favor of Cimpl's for its remaining purchases from C&M Dairy. The essence of the court's ruling was that: (1) C&M Dairy was the seller for purposes of notice under the FSA; (2) C&M Dairy was not on the master list and therefore Cimpl's did not receive written notice of Fin-Ag's security interest as required by the FSA; and as a result, (3) the FSA protected Cimpl's as a buyer in the ordinary course for those remaining purchases. Thereafter, Cimpl's filed an affidavit and notice of taxation of costs (disbursements). Fin-Ag objected to portions of Cimpl's claim. The circuit court granted Cimpl's disbursements in the amount of $1,848.62.

[¶9.]    Fin-Ag appeals, raising two issues:

Whether the FSA protected Cimpl's from liability for conversion.

Whether the circuit court abused its discretion in awarding Cimpl's disbursements.

**II.**

**A.**

*FSA Protection from Conversion in Purchasing Farm Products*
*in the Ordinary Course of Business*

[¶10.]    Fin-Ag argues that FSA protection for the buyers of farm products was not available to Cimpl's for two reasons. First, Fin-Ag argues that for purposes of

notice, and despite the fact that C&M Dairy was the only identified seller in each instance: (1) Berwalds were the sellers; (2) Berwalds were listed as sellers on the master list; and therefore, (3) Cimpl's had written notice of Fin-Ag's security interest thereby disqualifying Cimpl's from protection under the notice exception of the FSA. Second, Fin-Ag points out that the FSA limits Cimpl's protection to take free of security interests "created by [Cimpl's] seller." *See* 7 USC § 1631(d). Therefore, Fin-Ag argues that even if C&M Dairy was the "seller" for purposes of the notice exception of the FSA, C&M Dairy did not create the security interest, Berwalds did. Accordingly, Fin-Ag argues that FSA protection was unavailable under the "created by the seller" limitation of the FSA, and Cimpl's was liable for the state law claims of conversion.

[¶11.] Our standard of review of the circuit court's summary judgment is well-settled:

> In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and [established] entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party[,] and reasonable doubts should be resolved against the moving party. . . . Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied.

Consol. Nutrition, L.C. v. IBP, Inc., 2003 SD 107, ¶8, 669 NW2d 126, 129 (citations omitted) (alterations in original).

[¶12.] To develop a proper framework for the analysis of the issues, we restate the history and purpose of the FSA. "Prior to 1985, the UCC generally reflected a policy that favored the rights of the holders of security interests." Fin

Ag, Inc. v. Hufnagle, Inc., 720 NW2d 579, 581 (Minn 2006). Under the UCC, a security interest in goods continued despite sale of those goods by the debtor. *Id*. (citing UCC § 9-306) (1972) (amended 2000); 3B ULA 33-34 (2002)). Although the UCC recognized an exception for "buyers in the ordinary course of business," that exception did not apply to buyers of farm products. *Id*. (citing UCC § 9-307) (1972) (amended 2000); 3B ULA 154 (2002)). Therefore, buyers of farm products were not protected from security interests created by their sellers. *Id*. Congress noted that this "farm products exception . . . force[d] innocent buyers of farm products to become unwilling loan guarantors, in essence assuming the credit supervision responsibilities that rightly belong with the lender who [was] making the profit off the loan to begin with." HR Rep No 99-271(I) at 108-9 (1985).

[¶13.]      Because Congress was concerned with this impact of the UCC on buyers of farm products, it enacted the FSA. *Hufnagle,* 720 NW2d at 582. The Congressional findings for enactment of the FSA are particularly relevant in this case:

> Congress finds that—
> (1)  certain State laws permit a secured lender to enforce liens against a purchaser of farm products even if the purchaser does not know that the sale of the products violates the lender's security interest in the products, lacks any practical method for discovering the existence of the security interest, and has no reasonable means to ensure that the seller uses the sales proceeds to repay the lender;
> (2)  these laws subject the purchaser of farm products to double payment for the products, once at the time of purchase, and again when the seller fails to repay the lender;
> (3)  the exposure of purchasers of farm products to double payment inhibits free competition in the market for farm products; and
> (4)  this exposure constitutes a burden on and an obstruction to interstate commerce in farm products.

7 USC § 1631(a).

[¶14.]     Congress enacted the FSA to alleviate these concerns by removing such burdens on and obstructions to interstate commerce in farm products.  7 USC § 1631(b).  "'To achieve this purpose, the Act shifts the burden of potential loss from the buyers and commission merchants to the lenders who finance farm operations.'"  Mercantile Bank of Springfield v. Joplin Reg. Stockyards, Inc., 870 FSupp 278, 282 (WDMo 1994) (quoting Food Servs. of Am. v. Royal Heights, Inc., 850 P2d 585, 587 (WashCtApp 1993) (citing Lisco State Bank v. McCombs Ranches, Inc., 752 FSupp 329, 334 (DNeb 1990))).

[¶15.]     Thus, the FSA generally protects a buyer of farm products from liability for conversion.  It does so by preempting UCC provisions and creating a general rule protecting buyers in the ordinary course of business who purchase farm products subject to a lender's security interest.  Notably, the House Reports make clear that the FSA was specifically intended to remove the buyer's obligation to diligently check public records:

> [The FSA was] . . . intended to preempt state law (specifically the so called "farm products exception" of [UCC] Section 9-307) to the extent necessary to achieve the goals of this legislation. Thus, this Act would preempt state laws that set as conditions for buyer protection of the type provided by the bill requirements that the buyer check public records, obtain no-lien certificates from the farm products sellers, or otherwise seek out the lender and account to that lender for the sale proceeds.

HR Rep No 99-271(I) at 110.  Additionally, the protection is afforded even if the buyer has actual knowledge of the existence of that security interest:

> . . . a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take

> free of a security interest created by the seller, even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 USC § 1631(d).

[¶16.] The protection is, however, subject to notice exceptions and one limitation. "Under the [ ] notice exceptions[,] a buyer of farm products takes subject to a security interest created by the seller when notice has been given by one of three specified notice procedures." *Hufnagle,* 720 NW2d at 582 (citing 7 USC § 1631(e)). Under the notice exception at issue in this case, no FSA protection is afforded if the state establishes a central filing system and the buyer receives written notice under that system that the seller and the collateral are subject to an EFS. 7 USC § 1631(e)(3).[8]

[¶17.] Significantly, the FSA specifically provides that a buyer of farm products is subject to a security interest only if the *secured party* complies with this

---

8. The exception provides:

> (e) A buyer of farm products takes subject to a security interest created by the seller if—
> (3) in the case of a farm product produced in a State that has established a central filing system, the buyer—
> (A) receives from the Secretary of State of such State written notice as provided in subsection (c)(2)(E) or (c)(2)(F) that specifies both the seller and the farm product being sold by such seller as being subject to an effective financing statement or notice; and
> (B) does not secure a waiver or release of the security interest specified in such effective financing statement or notice from the secured party by performing any payment obligation or otherwise.

7 USC § 1631(e)(3).

notice exception in 7 USC § 1631(e).  7 USC § 1631(d) (emphasis added).  Further, "the FSA deleted the 'good faith and without knowledge' requirement to protect buyers even though they know of the existence of a perfected security interest." Farmers & Merchants State Bank v. Teveldal, 524 NW2d 874, 878 (SD 1994) (citing *Lisco State Bank*, 752 FSupp at 334).  Consequently, "the test is not whether [the buyer] had actual notice that the sale violated a security interest, but whether [the buyer] takes subject to the [secured party's] security interest because there was compliance [by the secured party] with one of the exceptions defined in the Act."  Ashburn Bank v. Farr, 426 SE2d 63, 65 (GaCtApp 1992).

[¶18.]        In addition to the notice exceptions, there is one limitation on the protection afforded buyers in the ordinary course.  A buyer only takes free of security interests "created by the seller" from whom the buyer acquired the farm product.  7 USC § 1631(d).  This limitation is similar to the "created by the buyer's seller" limitation in SDCL 57A-9-320[9] (UCC § 9-320, formerly § 9-307) for those who buy in the ordinary course of business.  *Hufnagle*, 720 NW2d at 582.  Under the FSA limitation, there is generally no protection if the underlying security interest was created by someone other than the buyer's immediate seller.  *Id*.

---

9.    SDCL 57A-9-320(a) provides:

> Except as otherwise provided in subsection (e), a buyer in ordinary course of business, other than a person buying farm products from a person engaged in farming operations, takes free of a security interest *created by the buyer's seller*, even if the security interest is perfected and the buyer knows of its existence.

(Emphasis added).

[¶19.] Accordingly, under the applicable notice exception, Cimpl's took subject to Fin-Ag's security interest if Fin-Ag's EFS in the Secretary of State's master list provided written notice that the seller and the cattle were subject to Fin-Ag's security interest. 7 USC § 1631(e)(3). And, under the limitation, Cimpl's took subject to Fin-Ag's security interest if the security interest was created by someone other than Cimpl's immediate seller. 7 USC § 1631(d). Because C&M Dairy was the only identified seller in the sales at issue, there are two "seller" questions that must be resolved to determine whether the FSA protected Cimpl's: (1) was C&M Dairy the seller of the cattle within the meaning of the written notice exception of the FSA; and (2) should C&M Dairy be regarded as the seller who created Fin-Ag's security interest within the meaning of the FSA limitation.[10]

**B.**

*Who Was the Seller For Purpose of Written Notice?*

[¶20.] Although the term "seller" is employed for these purposes in the FSA, it is, unfortunately, undefined. 7 USC § 1631(c)). When the text of a statute is unclear, courts "must look beyond the bare text of [the statute] to the context in which it was enacted and the purpose it was designed to accomplish." Jones v. R.R. Donnelley & Sons Co., 541 US 369, 377, 124 SCt 1836, 1842, 158 LEd2d 645 (2004). Similarly, "where there is 'ambiguity in the statutory language,' we must 'look beyond the statutory language to [legislative history and] the statute's purpose to

---

10. The circuit court did not address the question whether C&M Dairy should be regarded as the seller who created the security interest.

determine its meaning.'" Garcia v. Dept. of Homeland Sec., 437 F3d 1322, 1350 (FedCir 2006) (quotation and citation omitted) (alteration in original).

[¶21.]      In determining the meaning of the term "seller," Fin-Ag points out that South Dakota's Uniform Commercial Code defines "[s]eller" as "a person who sells or contracts to sell goods." SDCL 57A-2-103(1)(d). Under this definition, Fin-Ag argues that C&M Dairy must be a "person" in order to be considered the "seller." Fin-Ag argues that C&M Dairy was a fictitious name used by Berwalds, and therefore C&M Dairy was not a "person" within the notice exception of the FSA. We disagree.

[¶22.]      The FSA defines "person" as "any individual, partnership, corporation, trust, or *any other business entity*." 7 USC § 1631(c)(10) (emphasis added); *see also* 9 CFR § 205.102 ("other entity" included as "person").[11] In this case, there is no dispute that Berwalds did significant business buying and selling cattle under their business d.b.a. C&M Dairy. Although there was no fictitious name filing for C&M Dairy, all business entities need not register, incorporate, or comply with formal statutory procedures to exist and transact business. For example, a partnership, which requires neither written articles of co-partnership nor an express agreement, is recognized merely by conduct of the parties. Rotzien v. Merchants' Loan & Trust Co., 41 SD 216, 170 NW 128, 129-30 (1918); *see also* SDCL 48-7A-202 (providing "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership").

---

11.    UCC § 1-201(30), SDCL 57A-1-201(30), defines "person" as "an individual or an organization."

Similarly, registration or filing is not a necessary element for the creation of a joint venture, *see Harriman v. United Dominion Indus., Inc.*, 2005 SD 18, ¶22, 693 NW2d 44, 50, which has been defined as "a less formal partnership" generally "entered into for a more limited business purpose and for a more limited time." A.P. & Sons Const. v. Johnson, 2003 SD 13, ¶13, 657 NW2d 292, 295 (citation omitted). Thus, informal joint ventures and even associations are recognized. They are merely:

> . . . a special combination of two or more persons, where in some specific venture a profit is jointly sought without the necessity of any actual partnership, corporate designation, or other business entity, or as an association of persons or legal entities to carry out a single business enterprise for profit. . . .

Ethan Dairy Prod. v. Austin, 448 NW2d 226, 228 (SD 1989) (citation omitted).

[¶23.]     Considering these other business relationships, C&M Dairy fits within the FSA definition of "any other business entity." 7 USC § 1631(c)(10). Whether C&M Dairy's technical, legal status was an informal partnership, a joint venture, an association, or other business, it was transacting substantial business buying and selling cattle in South Dakota. In fact, one of the companion cases reflects that C&M Dairy often *purchased* cattle one day, and less than one week later, paid for the purchase by selling cattle at issue in these cases. Thus, the *purchases*, as well as the sales, were effectuated under the name "C&M Dairy." *See* Fin-Ag, Inc. v. Pipestone Livestock Auction Market Inc., and Fin-Ag, Inc. v. South Dakota Livestock Sales of Watertown Inc., 2008 SD 48, ¶8, __ NW2d __, __. Under these facts, we are certainly not prepared to hold that absent formalistic creation, these types of informal business relationships have no meaning and do not exist.

[¶24.] This conclusion is supported by the nature and history of the business conducted under the name C&M Dairy. Calvin Berwald testified in his deposition that C&M Dairy was an old business name Berwalds used mostly for buying and selling cattle, and business was transacted under that name for about ten years. Arlen Berwald testified that C&M Dairy was a business that Calvin and Michael conducted for the purchase and resale of cattle, and that C&M Dairy maintained bank accounts at Farmers State Bank and Dacotah Bank. In this case, there is no dispute that Berwalds used the name C&M Dairy to sell cattle to Cimpl's since 1995. C&M Dairy was the only name given to Cimpl's when the cattle were presented for sale and the only name placed on the proceeds checks. As Calvin Berwald confirmed in his deposition, C&M Dairy was "the only way those people know us."

[¶25.] Furthermore, although Calvin and Michael Berwald delivered most of the cattle to Cimpl's, this did not necessarily mean that they were delivering the cattle in their individual capacity. In every relevant instance, C&M Dairy was identified as the seller, and as far as Cimpl's knew, Calvin and Michael were delivering the cattle on behalf of their business identified by the d.b.a. C&M Dairy. Under these circumstances, the FSA did not require Cimpl's to ascertain the precise legal status of C&M Dairy at the time of sale. As previously noted, Congress specifically indicated that buyers often have no practical method for discovering the existence of an applicable security interest, and the FSA was intended to relieve the buyer of the obligation to diligently check public records to protect itself. *See supra* ¶¶13-15 (citing USC § 1631(a) (1) and HR Rep No 99-271(I) at 110).

[¶26.] Fin-Ag, however, argues that C&M Dairy was a "nonexistent entity." To support this assertion, Fin-Ag relies on the deposition of Calvin Berwald, taken in a bankruptcy proceeding, stating that C&M Dairy is no longer an entity. Fin-Ag also points out that C&M Dairy was not listed on any financial statements submitted to Fin-Ag, it was not on any income tax returns, and there were no UCC or fictitious name filings referencing C&M Dairy. Fin-Ag, however, concedes in its brief that C&M Dairy was listed as a d.b.a. in the bankruptcy. More importantly, in his deposition, Calvin Berwald indicated that C&M Dairy was the Berwalds' cattle business (although no longer used). Calvin Berwald testified: "C&M Dairy was our Clear Lake facility, which we used mostly for buying and selling cattle. I mean we used that—that deal for, I mean, I suppose ten years. There was a milk permit under there, too." Arlen Berwald explained that the use of C&M Dairy was terminated only after Fin-Ag told them they could not sell cattle through C&M Dairy.

[¶27.] Ultimately, the question is not the legal status of the business entity Berwald's were using to conduct their cattle business: the question is whether Berwald's business d.b.a. is a seller under the FSA. In support of its argument, Fin-Ag relies on authorities that primarily question whether a real person may be held liable for acts of a d.b.a.—not whether a d.b.a. may be recognized as a "seller" under the FSA. More importantly, Fin-Ag fails to recognize that even if one wishes to debate the legal entity status of transacting business under a d.b.a., the applicable rules for the South Dakota central filing system required Fin-Ag to have listed C&M Dairy as a separate name on its EFS. The South Dakota Administrative

Rules implementing the FSA central filing system provide that the "use of doing business as is considered an additional debtor and shall be listed as such with the elimination of the doing business as." ARSD 5:04:04:20(4) (discussing effect of amendment of financing statement to include new debtor). *See also* Chris Nelson, Secretary of State, Filing Procedures Uniform Commercial Code 7 (2003) (use of D/B/A, F/K/A, or A/K/A is considered an additional debtor and must be listed as such for accurate searches).[12] Accordingly, no matter what the precise legal status of the d.b.a. C&M Dairy, it was considered an additional debtor that required a separate listing for the purpose of giving notice under the FSA.

[¶28.]     Fin-Ag, however, urges this Court to adopt a "know your seller rule." The dissent agrees, arguing that "it would be relatively easy for the Sale Barn [or Buyer] to dig past the fictitious name and inquire as to the proper owner and seller of the cattle." *Infra* ¶69. In addition to providing no authority to support such a rule, were this Court to adopt it, Cimpl's (and similarly situated commission merchants) would become liable for such farm product sales even though they had no duty to determine from the public record the precise legal relationship among debtors like the Berwalds and C&M Dairy. The FSA specifically relieves buyers of any obligation to check public records other than the master list in order to avoid the perils of having failed to remit proceeds to the secured party. HR Rep No 99-

---

12.    This state provision is not in conflict with the FSA. 7 USC § 1631(c)(2)(C)(ii)(I) contemplates that the master listing of debtors may separately include "debtors doing business" under a different name. The FSA also requires state systems to be certified. 7 USC 1631(c)(2). The federal regulation implementing this provision, CFR § 205.103(b), provides states with the discretion to require additional information on an EFS.

271(I) at 110; 7 USC § 1631(e). Furthermore, under the FSA, a buyer of farm products in this situation becomes subject to a security interest only if the *secured party* complies with the notice exception in 7 USC § 1631(e). 7 USC § 1631(d); *Ashburn Bank*, 426 SE2d at 65. Therefore, Cimpl's had no duty to investigate the legal status of C&M Dairy and resulting ownership of the cattle: it was Fin-Ag's duty to follow the Secretary of State's FSA regulations and list the d.b.a. "C&M Dairy" as an additional debtor. Ultimately, Fin-Ag and the dissent's "know your seller" rule would charge Cimpl's with imputed knowledge that Calvin and Michael Berwald were doing business as C&M Dairy and that they were the legal owners of the cattle. Imputing such knowledge, or requiring buyers to ascertain such knowledge under a "know your seller" rule, would disregard the explicit language of 7 USC § 1631(d), which provides that the buyer takes free of the security interest even if the buyer knows of the existence of such interest. Fin-Ag's proposed rule would also place the burden of the debtor's fraud on the buyer and effectively return South Dakota to pre-FSA law.[13]

[¶29.]     For the foregoing reasons, this Court concludes that C&M Dairy qualified as a seller within the meaning of the FSA. And because C&M Dairy

---

13.    Fin-Ag's proposed "know your seller rule" is contrary to Congressional intent "to shift the potential burden of loss in cases of the sale of farm products to the lenders who finance farm operations, rather than have that burden imposed upon buyers, thus inhibiting interstate commerce." *Lisco State Bank,* 752 FSupp at 334; *see also In re* Julien Co., 141 BR 384, 388 (WDTenn 1992) ("In its abrogation of the 'farm products exception,' Congress intended to reallocate the loss from the buyer to the farm products lender when the borrower defaults") (citing United States v. Progressive Farmers Mktg. Agency, 788 F2d 1327, 1331 (8thCir 1986)).

was the only seller identified in each sale, Fin-Ag's failure to include C&M Dairy on its EFS disqualified Fin-Ag from invoking the written notice exception to FSA protection under 7 USC § 1631(e)(3). Because the written notice exception did not eliminate Cimpl's' FSA protection, the next question is whether Cimpl's' FSA protection was eliminated by the "created by the seller" limitation in 7 USC § 1631(d).

## C.

### *When is a Seller Regarded to Have Created a Security Interest?*

[¶30.] This Court has not interpreted the "created by the seller" limitation in a similar d.b.a. situation. The Minnesota Supreme Court interpreted the limitation in a "fronting situation," where a farmer used separate and distinct real persons-- his hired help and his children--to sell farm products subject to a security interest the farmer had created. *Hufnagle*, 720 NW2d at 584. The Minnesota Supreme Court concluded that the term "seller" should mean the same thing for the notice exception and for the created by the seller limitation. Therefore, it held that because the fronting children and hired help did not create the security interest, the buyer took subject to the security interest. *Id.* at 586.

[¶31.] The fronting situation in *Hufnagle,* however, is distinguishable from the d.b.a. situation for two reasons. First, the summary judgment record submitted in *Hufnagle* did "not fully explain the circumstance under which the [fronting parties] became involved with the sales to [the buyer]." *Id.* at 584. The Minnesota court acknowledged that it did not know the actual relationship between the owner and fronting parties, and the court assumed three potential scenarios. The fronting

party was: (1) an agent selling on behalf of the owner as an undisclosed principal; (2) a commission merchant or selling agent; or (3) the owner of the farm product who was selling on his/her own behalf. *Id.* Although the court ultimately concluded that these three types of fronting persons could not be sellers of the debtor's property and simultaneous creators of the debtor's security interest, the *Hufnagle* court conceded its conclusion was based on the "factual scenarios possible *on this record. . . .*" *Id. Hufnagle* did not, however, consider the fourth factual scenario that is before this Court, i.e., debtors who created the security interest, and conducted their business under their d.b.a. business name.

[¶32.] Unlike *Hufnagle*, Berwalds created the security interest, but did not transfer the collateral to a distinct, real person for a later sale. They utilized their d.b.a. to sell the cattle themselves. Therefore, for purposes of the created by the seller limitation, Berwalds cannot be separated from the acts of their d.b.a. C&M Dairy. *See* Jaffe v. Nocera, 493 A2d 1003, 1008 (DCCtApp 1985), providing, "'[t]he ordinary sense of the words' X, d/b/a Y, Inc. should 'convey the message' that X remains personally liable for this entity's (Y's) obligations." (quoting S. Ins. Co. v. Consumer Ins. Agency, Inc., 442 FSupp 30, 31 (EDLa 1977). This is far different than *Hufnagle* where separate and distinct sellers sold the collateral without having any business relationship or interest in the debtor's business.[14] *Hufnagle*

---

14. The dissent is incorrect in stating that this opinion is inconsistent because it declares that C&M Dairy is an entity, "separate and distinct" from the Berwalds. *See infra* ¶62. On the contrary, this opinion is specific in noting that "unlike *Hufnagle*, Berwalds created the security interest but did not transfer the collateral to a distinct, real person for a later sale. They utilized

(continued . . .)

specifically noted that collateral was sold "in the names of third persons not involved with the debt to [seller]." *Hufnagle*, 720 NW2d at 580.

[¶33.]      *Hufnagle* is further distinguished because it appeared to involve collusion on the part of the buyer. Fin Ag, Inc. v. Hufnagle, Inc., 700 NW2d 510, 518 (MinnCtApp 2005). Although the Minnesota Supreme Court did not specifically rely on this fact, it did not reject the Minnesota Court of Appeal's analysis noting the extensive previous sales relationship between the owner of the cattle and the buyer, and the familial and employment relationships of the supposed "sellers" to the actual owner. *Id*. One such relationship involved sales by and proceeds checks payable to the owner's children, one of whom was only five years old at the time of sale. *Id*. Thus, *Hufnagle* involved a buyer that apparently knew of the lien and appeared to be a participant in the scheme to defraud the creditor. In this case, Fin-Ag concedes there was no collusion, and Cimpl's neither knew of the lien nor was a participant in the scheme to defraud Fin-Ag.

[¶34.]      More fundamentally, however, we disagree with *Hufnagle's* "created by the seller" legal analysis for two reasons. First, as previously noted, *Hufnagle* did not have an adequate factual record on summary judgment, *see supra* ¶31 citing *Hufnagle*, 720 NW2d at 584, and the court therefore assumed the fronting situation involved one of three scenarios. The only scenario that could be applicable here is the *Hufnagle* example of a sale by an undisclosed principal. In its analysis

---

(. . . continued)

        their d.b.a. to sell the cattle themselves." *Supra* ¶32. It was *Hufnagle*, not
        this case, that involved separate and distinct entities selling farm products.

of this scenario, however, the Minnesota court incorrectly assumed that one who deals with the agent of an undisclosed principal has knowledge of the undisclosed principal's identity and, therefore, notice of an EFS under the undisclosed principal's name. The entire *Hufnagle* analysis is premised on this incorrect assumption:

> If we view [the owner of the collateral] as the seller, assuming that the [fronting party] sold the collateral as agents for [the owner] as an undisclosed principal, the exception in section 1631(e) for [notice of ] a security interest as to which notice has been given would apply because [the buyer] received notice of [the lender's] interest against [the owner], and [the buyer] did not secure a waiver of the interest from [the lender].

720 NW2d at 586 (citing 7 USC § 1631(e)(3)). As is readily apparent, this analysis assumes that in this scenario the buyer would have EFS notice of the lender's security interest because the buyer would have notice of the agent's undisclosed principal's name. However, by definition, one cannot have notice of the principal's name for purposes of notice when the agency relationship involves an *undisclosed* principal. The dissent makes the same mistake. *See infra* ¶61.

[¶35.] We also disagree with *Hufnagle* because its "created by the seller" analysis is premised on the observation that legislative intent does not support the notion that a seller could be considered differently, depending on the context in which it is used. *See Hufnagle*, 720 NW2d at 588-89. In our view, *Hufnagle* overlooked two instructive statements of Congressional intent. In the first, dealing with the reason for preempting all provisions of state law that prevented buyers in the ordinary course from taking free of agricultural lenders' security interests, Congress noted that innocent buyers of farm products should not . . .

> become unwilling loan guarantors, in essence assuming the
> credit supervision responsibilities that rightly belong with the
> lender who is making the profit off the loan to begin with.
> [Especially where a]t the same time, farm product buyers have
> no control over the lender's practice, and receive no
> compensation in the form of interest to cover the risk exposure
> and jeopardy unknowingly and unwillingly assumed.

HR Rep No 99-271(I) at 109. And in the second, with respect to notice, Congress specifically intended to preempt state laws that require buyers to "check public records, obtain no-lien certificates from the farm products sellers, or otherwise seek out the lender and account to that lender for the sale proceeds." *Id*. at 110.

[¶36.]     In light of this express intent, for purposes of the notice exception, it is unreasonable to conclude that Congress intended to require a buyer like Cimpl's to determine the legal status of C&M Dairy or be subjected to constructive notice that Berwalds were legally the sellers. Cimpl's simply had no duty, other than to check the master list, to determine whether C&M Dairy was a seller on Fin-Ag's EFS. Likewise, with respect to the created by the seller limitation, we believe it is unreasonable to conclude Congress intended that buyers, acting in the ordinary course of business, would not be protected by the FSA from debtors who created a security interest in collateral and subsequently utilized their business d.b.a. in selling the collateral.

[¶37.]     In addition to instructive Congressional intent, *Hufnagle* also failed to consider several cases that have considered the created by the seller limitation in factual contexts more akin to the d.b.a. seller in our case. Although these courts interpreted UCC § 9-307 (now UCC § 9-320), the cases are applicable because when the FSA was enacted, it adopted the UCC "created by the seller" language.

*Hufnagle,* 720 NW2d at 585. Furthermore, FSA implementing regulations specifically recognize that court decisions involving UCC terms within the farm products exception in Section 9-307(1), which are not defined in the FSA, are applicable in interpreting the FSA. 9 CFR § 205.211 (2006).

[¶38.] In one case that *Hufnagle* considered but rejected, the Eighth Circuit Court of Appeals concluded that a farmer, who sold farm products to an elevator that he also owned, was the seller who created the security interest even though the elevator was the immediate seller to the ultimate purchaser. First Bank of N.D. (N.A.)-Jamestown v. Pillsbury Co., 801 F2d 1036, 1038-40 (8thCir 1986). In considering the limitation, the court treated the security interest as being created by the elevator because the farmer, who actually created the security interest, was the owner of both the farming operation and the elevator. *Id*. at 1039-40. The Eighth Circuit Court of Appeals did so even where, unlike this case, the grain elevator was legitimately incorporated as a separate entity. *Id*. at n4. The court reasoned, "'the relationship between the former owner [of the collateral] and the [immediate] seller may be such that the security interest created by the former owner may be regarded as having been created by the seller. . . .'" *Id*. (quoting 9 *Anderson on the Uniform Commercial Code* § 9-307:8, at 194-95 (3d ed 1981) (alteration in original).

[¶39.] Both Iowa and Oklahoma have also declined to strictly construe the created by the seller limitation "where the creator of the prior lien and the immediate seller are separate but closely related entities, or the seller has been 'instrumental in creating the encumbrance and conflict.'" C&J Leasing II Ltd.

P'ship v. Swanson, 439 NW2d 210, 213 (Iowa 1989) (quoting Adams v. City Nat. Bank & Trust Co., 565 P2d 26, 31 (Okla 1977) (per curiam)) (citing G.M.A.C. v. Keil, 176 NW2d 837, 841 (Iowa 1970))). Unlike *Hufnagle*, the Iowa Supreme Court reasoned that the buyer was entitled to prevail over the "remote" lienholder because, "the legislature did not intend [the created by the seller language] to give 'preference [in cases where] a lien's . . . creator was not as shown on the records, but [was involved with] another party under a confidential transaction of which the ultimate purchaser had no knowledge.'" *Id.* (quoting *G.M.A.C.*, 176 NW2d at 841; *Adams*, 565 P2d at 31). The Iowa Supreme Court explained: "where a[n owner] who is not a secured party has been instrumental in creating an encumbrance and the resulting priority conflict for an innocent buyer in ordinary course, courts must apply broadly the 'by [the] seller' language [ ] to effectuate the statute's protective purposes." *Id.* at 214.

[¶40.] The Oklahoma Supreme Court reached the same conclusion. It explained the situation in which the created by the seller limitation was actually intended by citing the "most widely cited decision involving a security interest not 'created by his seller.'" *Adams*, 565 P2d at 30 (citing National Shawmut Bank of Boston v. Jones, 236 A2d 484 (NH 1967)). The Oklahoma court explained that the intended application only involves a security interest not created by the seller or by

the seller's related party, but by an entirely separate third person who completed a bona fide sale of the collateral to the immediate seller. *Id.*[15]

[¶41.]     Finally, like the Iowa and Oklahoma Supreme Courts, an Arizona court of appeals concluded "that the protection [for buyers] in the ordinary course under section 9-307(1) may potentially extend to a buyer from a seller who acquired the collateral from a related entity that is liable as debtor under a security agreement." Deutsche Credit Corp. v. Case Power & Equip. Co., 876 P2d 1190, 1197 (ArizCtApp 1994). Although *Deutsche* did not ultimately extend buyer in the ordinary course protection, it recognized that an "invocation of the 'alter ego' or 'piercing the corporate veil' doctrine" may be utilized to disregard separate corporate existence, so the owners could be viewed as both the creators of the security interest and the sellers of the collateral. *Id.* The Arizona court noted, "the corporate fiction will be disregarded when the corporation is the alter ego or business conduit of a person, and when to observe the corporation would work an injustice." *Id.*

---

15.     Ironically, even *Hufnagle* acknowledged this restricted, appropriate use of the created by the seller limitation, citing the illustration used in the comment to UCC § 9-320 (formerly § 9-307):

> Manufacturer, who is in the business of manufacturing appliances, owns manufacturing equipment subject to the perfected security interest in favor of Lender. Manufacturer sells the equipment to Dealer, who is in the business of buying and selling used equipment. Buyer buys the equipment from Dealer. Even if Buyer qualifies as a buyer in the ordinary course of business, Buyer does not take free of Lender's security interest . . . because Dealer did not create the security interest; Manufacturer did.

(continued . . . )

[¶42.]    Ultimately, the created by the seller limitation "was generally designed to insure compliance by a retailer under an agreement with his inventory financer not to sell without financer's permission." *Adams*, 565 P2d at 30. However, "[i]t is illogical to believe when the codal redactors drafted this limitation they anticipated a buyer would not be protected from misrepresentation by [a creator of a security interest] who had manipulated [the collateral] for his own benefit." *Id.* On the contrary, "[n]othing in the comments to Article 9 require the 'created by his seller' limitation to be an insurmountable barrier to good faith acquisition of pre-encumbered property from [a seller] who himself was instrumental in creating the encumbrance and conflict." *Id.* at 31.

[¶43.]    Cimpl's case is even more persuasive than the foregoing authorities because, unlike those cases, Berwalds and C&M Dairy were not separate corporations. C&M Dairy was the d.b.a. for Calvin and Michael Berwald, and C&M Dairy was the name under which Berwalds conducted their cattle business. Legally, C&M Dairy was the Berwalds. Therefore, we need not pierce a corporate veil to conclude that C&M Dairy was the alter ego of Berwalds. Because C&M Dairy was the alter ego of the Berwalds, and because Berwalds created the security interest, C&M Dairy must be regarded as the seller who created the security interest.

---

(. . . continued)
    *Hufnagle, Inc.*, 720 NW2d at 585 (quoting UCC § 9-320, cmt 3 (2000), 3 ULA 219-20 (2002)).

[¶44.]     We recognize that the Minnesota Supreme Court disagreed with the Eighth Circuit Court of Appeals analysis in *First Bank of N.D. (N.A.)-Jamestown*, and was unwilling to consider a "seller" in two different ways. *Hufnagle* did so, however, relying on the premise that there was no "significant indication that this was the legislature's intent." *Hufnagle*, 720 NW2d at 588-89. This rationale overlooked compelling expressions of congressional intent. *See supra* ¶35. The *Hufnagle* analysis also failed to consider the two different contexts and purposes for which the term "seller" is used in the FSA. With respect to the notice exception, Congress clearly required the lender's strict compliance with the identification of the seller on the EFS, and South Dakota has implemented rules that require secured parties to list a d.b.a. as a separate debtor. With respect to the created by the seller limitation, *Hufnagle* overlooked important cases that have identified legislative intent that this type of limitation was not intended to protect the secured party when related parties create the encumbrance and sell the collateral.

[¶45.]     The dissent follows the same path emphasizing that "[w]e certainly should not interpret seller two different ways, when many commentators have criticized the limitation 'created by the seller,' in the context of  9-307 [now 9-320 and the FSA], yet the clause has never been amended or eliminated since the UCC was rewritten in 1957." *Infra* ¶65 (citing *Hufnagle*, 720 NW2d at 585) (citing William H. Lawrence, *The "Created by His Seller" Limitation of Section 9-309(1) of the UCC: A Provision in Need of an Articulated Policy,* 60 Ind. L.J. 73, 73-74 (1984-85); Richard H. Nowka, *Section 9-302(a) of Reviewed Article 9 and The Buyer in the Ordinary Course of Pre-Encumbered Goods: Something Old and Something New,* 38

Brandeis L.J. 9, 23-24 (1999-2000)). The dissent fails to recognize, however, that these commentators would not support the dissent's literal application of the created by the seller provision. On the contrary, Professor Lawrence criticizes opinions like the dissent, which apply the created by the buyer's seller provision "in a mechanical fashion without any attempt to address the policy considerations." Lawrence, *supra*, 73. He cautions that "[b]y [such] mechanical jurisprudence . . . courts may satisfy their task of implementation . . . but they must look beyond the mere words to the context of their adoption in order to construe the statute in ways that will achieve its legislative purpose." *Id.* at 75-76. He points out that the purpose of the limitation is twofold. The first is to protect buyers in the ordinary course who are involved in apparent authority sales established by: entrustment of the collateral to debtors; inventory financing; and by placing the debtor in possession of goods when the debtor is in the business of selling goods of the same kind. *Id.* at 81-82. When some or all of these factors are present, the secured party is deemed to have vested the debtor with indicia of apparent authority protecting the buyer from the security interest. *Id.* The second purpose arises from agency law: protection is afforded a buyer under principles of entrustment of possession of the collateral and under the principle that a buyer who reasonably believes that the seller is the owner should be protected, even if the owner is an undisclosed principal. *Id.* at 85-86. Finally, Professor Lawrence points out that as between an innocent buyer and an innocent secured party, the laws' allocation of risk identifies the secured party as the party most responsible for loss. *Id.* at 95-96. Although relying on Professor Lawrence, the dissent fails to apply his analysis supporting

protection of the buyer in this case. (Professor Nowka sets forth analogous purposes for the provision; Nowka, *supra*, 23-24)

[¶46.] Ultimately, we agree with the Eighth Circuit Court of Appeals, and the Iowa, Arizona, and Oklahoma state courts. These courts either : (1) hold that the created by the seller limitation does not apply; or (2) treat the immediate seller as the entity that created the security interest when the immediate seller and the remote grantor of the security interest are closely related and the remote grantor was instrumental in creating the conflict.

[¶47.] For the foregoing reasons we conclude that, as the alter ego of Berwalds, C&M Dairy should be regarded as the seller who created the security interest within the meaning of 7 USC § 1631(d). And, because C&M Dairy was the only seller identified at sale, but was not identified on the master list, Cimpl's did not have written notice of the security interest under 7 USC § 1631(e)(3). Consequently, Cimpl's was entitled to FSA protection. Accordingly, Cimpl's took the cattle sold by C&M Dairy free of Fin-Ag's security interest, and Cimpl's cannot be liable for conversion. Because we dispose of Fin-Ag's appeal on the FSA, we do not reach the parties' other issues.

## III.

### *Disbursements*

[¶48.] Following the favorable judgment, Cimpl's sought the taxation of disbursements for copying costs of $1,256.17. The majority of the copying costs ($941.57) were for copying the "Berwald Loan File" maintained by Fin-Ag. Fin-Ag argues that these copies were not "necessarily incurred in gathering and procuring

evidence or bringing the matter to trial." SDCL 15-17-37. In support of this argument, Fin-Ag points out that only fifty pages of the 5,520 pages copied were actually used by Cimpl's to support its motion for summary judgment. Therefore, Fin-Ag maintains that Cimpl's is only entitled to recover disbursements for those fifty pages.

[¶49.] "We review an award of disbursements under an abuse of discretion standard." Behrens v. Wedmore, 2005 SD 79, ¶69, 698 NW2d 555. "When applying this standard, we do not inquire whether we would have made the same decision. Instead, we decide only whether the circuit court could reasonably reach the conclusion it did in view of the applicable law and the circumstances of the case." Maxner v. Maxner, 2007 SD 30, ¶12, 730 NW2d 619, 622. This Court has recognized that the trial court is in the best position to determine whether the number of copies is reasonable. Zahn v. Musick, 2000 SD 26, ¶51, 605 NW2d 823, 833.

[¶50.] Notably, SDCL 15-17-37 does not limit expenditures to those actually utilized at trial or filed with a motion. It also permits recovery for "gathering and procuring evidence or bringing the matter to trial." In this case, the record reflects that Cimpl's initially requested production of all documents in Fin-Ag's possession concerning loans made to Berwalds. Fin-Ag made the records available for inspection and review at its counsel's office. Fin-Ag also allowed Cimpl's to make the determination at that time as to what it wanted copied. After reviewing the files for a substantial period of time, Cimpl's requested that Fin-Ag copy the entire loan file. Fin-Ag complied with that request. It appears that there were numerous

documents in the loan file, and it was not known at that time what specific loan documents would become relevant in bringing the matter to trial.

[¶51.] After considering Cimpl's affidavit and Fin-Ag's objection, the circuit court granted Cimpl's disbursements. Considering the nature and complexity of these commercial transactions, Fin-Ag has not shown that this decision was an abuse of discretion.

[¶52.] Affirmed.

[¶52.] GILBERTSON, Chief Justice, and MEIERHENRY, Justice, concur.

[¶53.] SABERS and KONENKAMP, Justices, dissent.

SABERS, Justice (dissenting on all Fin-Ag cases on the FSA issue).

[¶54.] Incredibly, Fin-Ag presents this Court with authority from a neighboring state that is virtually on point to the circumstances of this case; yet, the opinion goes out of its way at every opportunity in its analysis of the issues to arrive at the opposite conclusion of the *Hufnagle* case. Because I cannot agree with the opinion's analysis and conclusions regarding FSA protection, I dissent.

[¶55.] In *Hufnagle*, the lender, Fin-Ag had a perfected security interest in Buck's corn crops. 720 NW2d 579, 580 (Minn 2006). Fin-Ag also filed an effective financing statement, "which caused the interest to be listed in Minnesota's central filing system." *Id.* Meschke was a registered farm products dealer and he received the central filing system's list of sellers whose grain was encumbered by security interests. *Id.* When Meschke bought corn directly from Buck he, with two exceptions, made the checks payable to Buck and Fin-Ag jointly. *Id.*

[¶56.]    Later, Meschke bought corn from persons, the Tookers, who claimed they were the sellers. *Id.* at 583-84. There was no one by the name Tooker on the central filing system list. Meschke bought corn from the Tookers seven different times. The proceeds from these seven transactions were deposited in the debtor's (Buck's) account. *Id.* Fin-Ag was not made a co-payee on any of these checks. *Id.*

[¶57.]    Fin-Ag sued Meschke for conversion after Buck failed to repay Fin-Ag. *Id.* The Minnesota district court granted summary judgment in favor of Fin-Ag. *Id.* On appeal, the Minnesota Court of Appeals affirmed. *Id.*

[¶58.]    The Minnesota Supreme Court held Meschke was liable for conversion. *Id.* at 581. In doing so, it noted that it must determine "how section 1631 works in the situation of 'fronting' sales. The parties describe 'fronting' as being where a seller of farm products that are subject to a security interest has a third party sell them under the third party's name." *Id.* at 584. The court recognized that "both Meschke and Fin-Ag can be viewed as innocent parties in the sense that they each did everything they were required or expected to do under the FSA." *Id.*

[¶59.]    The buyer, Meschke, made arguments that are similar to the Sale Barns' arguments in this case.[16] For instance, Meschke argued that it is difficult for a buyer of farm products to discover a security interest in a fronting situation and lenders are better suited to police these situations. Sale Barns advanced a virtually identical argument.

---

16. While Cimpl's is not a sale barn or commission merchant, the FSA treats it the same, and the references to Sale Barn include Cimpl's.

[¶60.] Despite this argument, and the recognition of the difficulty a fronting situation presents for a buyer, the Minnesota Supreme Court found it was "constrained to apply the plain language of the statutes, as enacted by Congress and the Minnesota Legislature, and to follow where they lead." *Id.* at 585. The court noted that the "created by the seller" language was a serious limitation on the FSA's protections afforded to the buyer. Moreover, the language has come under much criticism, but Congress "essentially incorporated this clause in section 1631 when it attempted to correct some of the other shortcomings, from the perspective of buyers, of UCC section 9-307." *Id.*

[¶61.] Due to this limitation, Meschke could not find protection, even in the fronting situation and even though he was an innocent buyer. The court noted:

> The inclusion of the "created by the seller" clause in section 1631 means that the statute does not provide protection for buyers in a fronting situation where the security interest from which protection is sought was not created by the fronting parties. *Under the facts of this case, no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest.* This is because **if we view Buck as the seller**, we must conclude that *Meschke's rights are subject to Fin Ag's security interest* under section 1631 because Fin Ag filed an "effective financing statement" that put Meschke on notice of Fin Ag's security interest in Buck's products. And, **if we view the Tookers as the sellers**, we must conclude *that Meschke's rights are subject to Fin Ag's security interest*, under either section 1631 or Minnesota's UCC, *because both statutes only protect a buyer from a security interest created by the seller and not from a security interest created by an undisclosed owner*, which continues in the product despite the sale.

*Id.* at 586 (emphasis added). Here, the same result is required, if we view Calvin and Michael Berwald as the seller, then Sale Barns' rights are "subject to Fin-Ag's

-33-

security interest under section 1631" because Fin-Ag filed an 'effective financing statement' that put [Sale Barns] on notice . . . ." *Id.* Alternatively, if we view C&M Dairy as the seller, then "we *must* conclude that [Sale Barns]' rights are subject to Fin-Ag's security interest" because under section 1631, a buyer is only protected "from a security interest created by the seller and not from a security interest created by an undisclosed owner." *See id.*

[¶62.] Instead, the opinion distinguishes *Hufnagle* by declaring "fronting" different than using a d.b.a.[17] It rationalizes that the *Hufnagle* court did not "consider the fourth factual scenario that is before this Court, i.e., debtors, who created the security interest, and conducted their business under their d.b.a. business name." *See supra* ¶31. However, when discussing if C&M Dairy can be a seller under the FSA, the opinion declares that C&M Dairy is an "other business entity," separate and distinct from the Berwalds. *See supra* ¶23 (quoting 7 USC § 1631(c)(10)). The use of a separate and distinct entity to sell cattle subject to a different owner's security interest is factually analogous to *Hufnagle*, and *is* fronting. As the Minnesota Supreme Court noted, "[t]he corn [cattle] had been sold to Meschke [Sale Barns] in the names of third persons [separate entity, C&M Dairy] not involved with the debt to Fin-Ag." *Hufnagle*, 720 NW2d at 580. This issue should be decided based on the rationale expressed in *Hufnagle*.

---

17. The opinion attempts to distinguish the *Hufnagle* case by explaining a fronting situation only occurs when a separate third person sells the product. However, what about the deliveries where Austin, Arlen, a semi-driver or some other unidentified person delivered cattle to the sale barns? Are these not third persons? Or are we to consider anyone who delivers cattle for C[alvin] & M[ichael] Dairy a part of that fictitious entity?

[¶63.]    The opinion can call it anything it wants, but it cannot hide what is plain and obvious.  In its attempts to decide this case in favor of the Sale Barns, it arrives at some conflicting conclusions.  For example, the opinion concludes that C&M Dairy is a "business entity" and therefore separate from Calvin and Michael Berwald and can be a seller under the statute, thus the FSA protects Sale Barns.  Then, in the next portion of analysis, C&M Dairy is merely a d.b.a. and cannot be separated from the Berwalds, therefore C&M Dairy created the security interest and again, Sale Barns win.  In reality, C&M Dairy is an illegal fiction and definitely a fronting situation.  It is not an entity or an alter ego – and certainly not both the "seller" and the "seller who created the security interest."

[¶64.]    There are two different interpretations of a supposed entity, yet the same strained outcome.  When defining "seller," it is inconsistent to say that in one instance C&M Dairy is an entity distinct from the Berwalds, so C&M Dairy can be the seller and claim Sale Barns did not receive notice of Fin-Ag's security interest, and then to say the Berwalds and C&M Dairy are "one and the same" in order to find C&M Dairy is the "seller who created the security interest."  In *Hufnagle*, the Minnesota Supreme Court specifically refused to "define seller two different ways in the same analysis without a significant indication that this was the legislature's intent.  No such indication [of legislative intent] exists here."  720 NW2d at 588-89.  We should not interpret seller two different ways.

[¶65.]    We certainly should not interpret seller two different ways when many commentators have criticized the limitation "created by the seller" in the context of 9-307, yet the clause has never been amended or eliminated since the UCC was

rewritten in 1957. *Hufnagle*, 720 NW2d at 585 (citing William H. Lawrence, *The "Created by His Seller" Limitation of Section 9-309(1) of the UCC: A Provision in Need of an Articulated Policy*, 60 Ind. L.J. 73, 73-74 (1984-1985) and Richard H. Nowka, *Section 9-302(a) of Reviewed Article 9 and The Buyer in the Ordinary Course of Pre-Encumbered Goods: Something Old and Something New*, 38 Brandeis L.J. 9, 23-24 (1999-2000)). Significantly, despite its criticisms, Congress included this clause in section 1631 of the FSA in 1985 when attempting to correct some of the other problems of buying food products under the UCC. *See* supra ¶60 (Sabers, J., dissenting) (citing *Hufnagle,* 720 NW2d at 585).

[¶66.]    White and Summers have discussed the difficulties with the "created by the seller" language. *See* 4 White & Summers, Uniform Commercial Code § 33-13 (4th ed 1995 & Supp 2007) (discussing the problems produced by the created by the seller language in former UCC § 9-307). Importantly, they theorize that: "Perhaps the drafters intended that as between two innocent parties the ultimate loss should fall on the party who dealt most closely with the 'bad guy.'" *Id.* Although this may conflict with the FSA policy, we have to presume that Congress knew what it was doing when it borrowed this language from the UCC.

[¶67.]    In each of the cases here,[18] the Sale Barns knew they were dealing with Calvin or Michael Berwald, or both, before they were dealing with "C&M Dairy." Calvin Berwald is the "C" and Michael Berwald is the "M" and the Sale

---

18.    Cimpl's may not have known C&M Dairy as Michael and Calvin Berwald specifically; however the deliveries were made by Austin, Calvin, Michael, or Arlen Berwald. The other sale barns had received deliveries of cattle from Michael and Calvin Berwald in the past as well.

Barns knew it, and they should suffer the ultimate loss. The Sale Barns either took a "head in the sand" approach and let the Berwalds tell them who they were acting as, or they simply decided that even though Berwald and family were listed in the master list, if the Berwalds chose to call themselves something else not mentioned on the list, the Sale Barns took the position they had to go strictly with the list.[19] In the *Watertown Livestock* case (2008 SD 49, __NW2d ___), the decision to go with C&M Dairy as the seller was self-serving, as it allowed the sale barn to collect on a past debt. *See* Fin-Ag v. Watertown Livestock, Brief of Appellee at 4, 2008 SD 49, __NW2d__, __. In sum, these Sale Barns were more closely dealing with the "bad guy."[20]

---

19. Either way, when compared to *Hufnagle*, these facts make it a much stronger case for Fin-Ag to prevail because in *Hufnagle*, the buyer was not dealing with the owner/debtor, Buck, but was dealing with completely unrelated sellers, the Tookers. Here, Sale Barns dealt solely with the Berwalds simply using an unregistered, fictitious name. The Sale Barns knew they were dealing with the Berwalds fronting as C&M Dairy. Once again, it is not rocket science that the "C" in C&M Dairy stands for Calvin Berwald, and the "M" in C&M Dairy stands for Michael Berwald, especially when they or their father, Arlen Berwald, delivered the cattle.

20. Under South Dakota Law, it is not only a crime to sell mortgaged property without the mortgagee's consent, *see* SDCL 44-1-12, it is also a crime under SDCL 37-11-1, for any person to engage in or conduct a business for profit in South Dakota "under any name which does not plainly show the *true surname* of each person interested in such business unless a statement is filed first." (Emphasis added). Furthermore, South Dakota has had a fictitious name certificate statute for at least sixty-nine years. The fictitious name certificate must be filed in the register of deeds office or secretary of state's office. Penalties are provided for failure to file and it constitutes a misdemeanor.

    Although these issues were not raised in the briefs, the Sale Barns are "presumed to know the law" and should not benefit from two separate violations of the criminal law.

[¶68.]     It does not end there. Again, in an attempt to distinguish *Hufnagle*, the opinion indicates that *Hufnagle* "appeared to involve collusion on the part of the buyer." *See supra* ¶33. Never mind the fact that the Supreme Court of Minnesota did not rely on that specific fact in its analysis and it is not relevant to the discussion. It merely seeks to cloud the real issues. Indeed, the court noted that "no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest." *Id.* at 586.

[¶69.]     The opinion's analysis of this issue sends the message to deceitful debtors that they can avoid the security interest if they use their initials as a fictitious name to sell their collateral to sale barns. The opinion blindly accepts the answer of the driver of the cattle truck to the yardman that the seller is "C&M Dairy," even if the driver of the truck is Calvin Berwald, Michael Berwald or their Father, Arlen Berwald. Interpreting the statutes in this manner produces the exact result we should prohibit – absurd. The opinion claims the burden should be on the lender, the party who is more capable of policing this problem. However, it seems it would be next to impossible for a lender to prevent its debtor from creating a fictitious name, with no fictitious name filing, and selling cattle under that name, while it would be relatively easy for the Sale Barn to dig past the fictitious name and inquire as to the proper owner and seller of the cattle.

[¶70.]     Finally, the opinion thoroughly discusses the background of the enactment of the FSA. It details the overarching theme of protecting buyers from the threat of double payment. Then, the opinion finds the statute ambiguous, because seller is not defined, and declares that we must use the policy behind the

act to interpret the statute. *See supra* ¶20. Thus, according to the opinion, we must interpret the statute to favor the Sale Barns.

[¶71.] However, failure to define a term does not automatically result in an ambiguity. Jackson v. Canyon Place Homeowner's Ass'n, 2007 SD 37, ¶11, 731 NW2d 210, 213 (citing Halls v. White, 2006 SD 47, ¶8, 715 NW2d 577, 581). Moreover, we consistently only use the plain language of the statute and never examine the policy or legislative history unless the text is ambiguous. "Resorting to legislative history is justified only when legislation is ambiguous, or its literal meaning is absurd or unreasonable. Absent these circumstances, we must give legislation its plain meaning. We cannot amend [the statute] to produce or avoid a particular result." *In re* Estate of Howe, 2004 SD 118, ¶41, 689 NW2d 22, 32 (quoting Slama v. Landmann Jungman Hosp., 2002 SD 151, ¶7, 654 NW2d 826, 828 (quoting Petition of Famous Brands, Inc., 347 NW2d 882, 885 (SD 1984))); *see also In re* Estate of Olson, 2008 SD 4, ¶38, 744 NW2d 555, 566; Jensen v. Turner County Bd of Adjustment, 2007 SD 28, ¶5, 730 NW2d 411, 413; Goetz v. State, 2001 SD 138, ¶16, 636 NW2d 675, 681; Reider v. Schmidt, 2000 SD 118, ¶9, 616 NW2d 476, 479. As Judge Timm noted in the companion cases, "[t]he FSA is not ambiguous, and the seller using a different name does not create an ambiguity in the language of the statute." We should interpret seller consistently. If interpreted consistently and using the plain language of the statute, the Sale Barns are not protected by the FSA. It takes an owner or someone with interest in the property to create a security interest. If Congress meant a fiction or a front instead of the word seller, it would have said so.

[¶72.]	There is a scarcity of authority on this issue.  We should refuse to engage in statutory interpretation that so heavily favors the Sale Barns to a lender's disadvantage without a clear directive from Congress to do so.  The rationale and holding set forth in *Hufnagle* should be the law of South Dakota.  In summary:

Cimpl's (#24172)--

1.	I would reverse Judge Rusch on the FSA seller issue for the reasons stated in my writing.

2.	I would remand all other issues not reached by Judge Rusch for determination of genuine issues of material fact.

3.	I would reverse the Order for Disbursements because Cimpl's should not win this lawsuit at this point.

[¶73.]	KONENKAMP, Justice, joins this dissent.